[Crim. No. 22418. June 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY LEE GUZMAN, Defendant and Appellant.

[No. S002482. June 28, 1988]

In re GARY LEE GUZMAN on Habeas Corpus.

924

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Edward H. Schulman, Chief Assistant State Public Defender, Steven Parnes, Larry R. Pizarro, Michael Tanaka, Cheryl Lutz, Richard Lennon and Antonia D. Radillo, Deputy State Public Defenders, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Joel Carey and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—This is an automatic appeal from a judgment imposing a penalty of death under the 1978 death penalty law. (Pen. Code, § 190.1 et seq.; see *id.*, § 1239, subd. (b)).)[1]

Defendant was charged with murder (§ 187), burglary (§ 459), robbery (§ 211), kidnapping (§ 207), and rape (§ 261, subd. (3)). Felony-murder

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

special circumstances were charged as to each of the latter four felonies. (§ 190.2, subd. (a)(17).) Defendant was also charged with, and admitted, two prior rape convictions for which he had served separate prison terms. (§ 667.5, subd. (c).) The jury found defendant guilty as charged, found all of the special circumstances true, and fixed the sentence at death. Additionally, the court imposed an aggregate sentence of 37½ years in prison on the burglary, robbery, kidnapping and rape counts. A petition for a writ of habeas corpus has been filed in conjunction with the appeal. For the reasons discussed below, we affirm the judgment in its entirety and deny the petition.

## I. FACTS

### A. *Guilt Phase*

About 5 p.m. on Friday, August 1, 1980, Linda Rogers, the sole salesperson on duty at the Treehouse Boutique in Modesto, was robbed and kidnapped. Rogers's disappearance was discovered a short while later when a customer, Linda Spinelli, entered the store. Spinelli reported Rogers's disappearance to the clerk of another store next door. That person called Rogers's mother, who notified the owner of the Treehouse and the police.

The police found the Treehouse cash register empty. Rogers's slacks and panties were found in a dressing room. Her car was still in the parking lot. Spinelli told the police that just before she entered the Treehouse she had seen a suspicious-looking man in a "ratty" car parked on the street. She considered locking her car, but decided that the day was too hot. When she left the Treehouse about 15 minutes later, the man was gone.

Several days later, Spinelli selected a photograph of defendant as looking "very much like" the man in the car. She also selected defendant from a live lineup as the man she had seen.

On the morning of August 2, Rogers's body was found in an orchard outside Modesto. A coat from the Treehouse was wrapped around her; it had holes in it consistent with knife wounds. She had been stabbed numerous times in the chest and back with a single-edged eight-inch knife and had been hit over the head with an object that might have been a baseball bat. Her bra was wrapped around her waist. A strip of blue cloth had been used with the bra to tie her hands. A pair of glasses was found near the body. The autopsy indicated sexual intercourse no more than 24 hours before her death. Bruises, which could have been caused by fingertips, were found on her thighs.

On Sunday, August 3, defendant's girlfriend, Dixie Jean Wallace, told the police defendant was involved in Rogers's murder. Wallace and defendant had been living together for several weeks at the home of Wallace's nephew, Richard Gardner, and his wife, Debbie. The following story emerged:

On the morning of August 1, Wallace and defendant had a fight about money. Wallace's welfare check was due that day but had not arrived in the mail. She was angry with defendant for not working or earning money. Defendant said, "What do you want me to do, a robbery?" She told him to do "whatever it takes," and defendant drove off in his car around noon. Debbie Gardner saw him take a kitchen knife as he left.

Wallace spent the afternoon at the home of her sister-in-law, Betty Gardner. Defendant drove to that house about 7 p.m., and Wallace left with him in the car. They drove back to Richard and Debbie's house, where he washed off a baseball bat in the lawn sprinkler and burned some blue cloth. He told Wallace he had "killed a dude," and offered her some money, which she refused.

That evening, defendant and Wallace drove to the orchard so he could find and dispose of the glasses and the coat, which he suspected might have his fingerprints on them. At trial, Wallace testified defendant had forced her at knifepoint to drive him. She also testified, however, that at his request she dropped him off at the orchard and returned to pick him up 10 minutes later. He had been unable to find the body or any clothing in the dark. Wallace drove him back to Richard and Debbie Gardner's home, where defendant told Richard he had killed a "biker."

Early on Saturday, August 2, Wallace told defendant he would have to leave the Gardners' home. She suggested, and he agreed, that he stay with her friends Peggy and Bill Foster in Turlock. He arrived at the Fosters' home at 7 a.m., and told them he was running from the police because he had killed a dope dealer. He spent the morning sleeping on the Fosters' couch.

Meanwhile, Wallace read of Rogers's rape and murder in the newspapers. When she called defendant to tell him the news, he admitted to her for the first time that the person he killed was a woman. He denied committing a rape.

There were several more phone calls between defendant and Wallace, arranged through Peggy Foster. Sometime on Sunday, August 3, Wallace contacted the police and arranged for them to listen to and record the calls.

By that time, defendant had been asked to leave the Fosters' house, but he continued to receive messages there from Wallace.

During one of the recorded conversations, defendant said he was sleeping in a car in the Bay Area but would soon have to leave for Fresno. He described the killing as "purely business," and explained that he had been caught in a situation in which he "did not have any choice." He said he had thrown the murder weapon out of his car a few miles from the orchard. He also said that he "should've just went and did it to Mike Dennis [the father of Wallace's daughter] that night" because "that's where all the anger was."

When defendant was arrested on August 7, the arresting officer told him he was charged with murder. He said, "And rape, too?"

The murder weapon was never found. Nor were any fingerprints from the Treehouse matched to defendant. No usable prints were taken from the coat or the glasses. A criminologist, however, did match the blue fibers found on Rogers's bra and on her person with those found at the orchard and in defendant's car. The fibers also matched those from the cloth given to the police by Wallace after defendant had attempted to burn it. Some gold fibers matching the carpet at the Treehouse were found on defendant's car floor on the driver's side.

The defense theory was that Wallace, perhaps with the help of an accomplice, killed Rogers to avenge the murder of a friend, Susan Atkins, by Rogers's brother several years earlier. Allegedly, Wallace then enlisted the cooperation of her relatives and friends to frame defendant for the Rogers murder. Leslie Bailey testified for the defense that he lived with Wallace during June and part of July 1980. According to Bailey, during that time, Wallace said she could not "get at" Rogers's brother, who was in prison.

Defendant testified that at the time of the murder he was drinking beer and smoking marijuana by himself near the Gardners' house. His account of the events on the morning of August 1 corresponded generally to those of Wallace. He testified that he left on August 2 because of the fight about money, and stayed with a friend in Pittsburg until his arrest.

B. *Penalty Phase*

The prosecution presented evidence of four previous rapes and an attempted rape committed by defendant. In January 1966 defendant accosted Karen K. in a Berkeley laundromat, escorted her at gunpoint to his room, tied her up, forced her to disrobe and attempted to have sexual intercourse with her. He was later convicted of this offense, and sentenced to prison.

In March 1973 defendant entered the bedroom of Deborah B. at 3 a.m. He placed a knife to her throat and threatened to kill her if she resisted or made any noise. He then tied her up, cut off her panties with his knife, took some money from her purse, dragged her to the floor, and committed several forced sex acts against her.

In April 1973 defendant, armed with a knife, attacked Kathrina O. in her apartment in the early morning hours. He tied her up, gagged her, and blindfolded her before committing multiple sex acts against her. Later in the afternoon of the same day, defendant attacked Linda H. and Martha G. in their Berkeley apartment. Again, he was armed with a knife, tied the victims' hands behind them and sexually assaulted them numerous times. He also forced them to perform sex acts with each other. After taking some money from Linda H. and tearing the telephone cord out of the wall, he fled. Defendant was convicted of each of the 1973 assaults and sentenced to prison.

Although defendant's two trial counsel in the present case had gathered evidence which in counsel's view would have demonstrated the appropriateness of a sentence of life imprisonment without possibility of parole, counsel never presented this evidence to the jury. Before commencement of the penalty phase trial, defendant informed his counsel and the court that he preferred a death sentence to life imprisonment. In a hearing conducted the day after the jury returned its guilt verdicts, defendant asked the court to relieve both his trial counsel because they would not assist him in persuading the jury to return a death verdict. This request was denied, but defense counsel, because of a perceived ethical bar to pursuing a goal inconsistent with their client's expressed desire, felt they could not present formal evidence in support of a life sentence. Accordingly, they did not call any of the witnesses they had subpoenaed, nor did they otherwise present any of the mitigating evidence available to them.

Defendant insisted on testifying on his own behalf. Although they felt ethically precluded from presenting evidence in support of a life sentence, defense counsel for personal moral reasons were unwilling to assist defendant in his effort to obtain a death sentence. Accordingly, they requested that he be allowed to testify in narrative form. The request was granted, and defendant testified as follows:

He began by asking that he "be given a death verdict." He stated that this request was not an admission of guilt, but a request for "mercy," and was "based on my own principles and values and morals as a human being."

He stated that he was not attempting to justify his previous rape convictions, because no punishment could erase the pain he had caused those

victims. Instead, his purpose (in addressing the jury) was to try to provide some understanding of why the events of his life had occurred, and to show that from his first awareness that "something was wrong," he had done everything in his power to solve and control the problems he had "inherited" in his life by informing the juvenile authorities, asking for help, and turning himself in to the police when he did commit a crime.

He explained that he did not know his mother; his parents were divorced before he was two years old and his father received custody. From age one to five years, he was placed in various homes, and his father periodically visited him. At age five he was placed in a private school for boys, but after two years his father, who could no longer afford the payments, removed him and placed him with a couple who were supposedly his aunt and uncle.

He began getting in trouble at the home of this couple. His aunt would sometimes lock him in a dark, windowless basement and on occasion not come home until 11 p.m.; she also beat him badly, for no apparent reason. At times his aunt stripped him naked, placed a sheet of newspaper in front of a dresser, poured rice on the newspaper, and made him kneel on it with both his hands raised like a cross. She then placed books on his hands, and when the books became too heavy and he dropped them, she would beat him. In the mirror, he would see her masturbating while he knelt. On other occasions she punished him by stripping him naked, strapping him to a bed, tying his hands to the bedposts and taking a razor strop to him. For lying, he was punished by having his hair cut off and being made to go to school that way.

At the age of 10 he came home and found his aunt in bed with a man other than his uncle. After that, "it was madness in that house." When he was caught stealing a model airplane from a store, his aunt cut off the tip of his finger. She would beat him with anything; a favorite weapon was a rubber cord that caused bloody welts. He still has scars on his head and buttocks from other injuries his aunt inflicted.

When he was 13, after his aunt discovered he had sneaked off to a show rather than going to work at a hotel that she partly owned, she beat him from about 5 p.m. until 2 a.m., breaking his arm. She then locked him in the closet until 6 a.m. and when he emerged the beating began anew. He ran away to the home of a school friend, and when his uncle came to get him, the friend's family would not let him go. Instead, they took him to the Catholic school he was attending, and a nun threatened his aunt that if it ever happened again she would call the police. By this time defendant did not care about anything and began to cause trouble.

He ran away at every opportunity until one night he was arrested and taken to juvenile hall for being out at 3 a.m. riding a stolen bike. Between the ages of 13 and 17, he was in juvenile hall 13 times.

He was paroled to a foster home and fell in love with his foster sister. After six months his foster parents discovered he was going to bed with his foster sister. He was taken back to juvenile hall, then another foster home, but for the next two years he frequently ran away to see the foster sister. This continued until he was 16, when he broke into the house of his aunt and uncle and tore up everything he could find. He was arrested and sent to the Youth Authority.

He then told the juvenile authorities that "there was some kind of problem going on" and they sent him to Atascadero State Hospital for a 90-day observation period. There he was told he was merely emotionally unstable, and that there was nothing seriously wrong with him. He was returned to juvenile hall, and then sent to Napa State Hospital. The hospital concluded his problem was not sufficiently serious for him to remain. On the way back to juvenile hall he escaped and was thereafter sent to prison at Tracy.

Defendant was 17 years old and weighed only 125 pounds when he arrived at Tracy. While he was working in the kitchen serving food two men approached and told him that they were going to rape him. A friend advised him that the next time they came through the line and said something like that he should hit them with whatever he had. This is what he eventually did, hitting one of them with a cake spatula and scalding him with hot coffee.

Defendant was then taken before the Youth Authority Board, which told him he had very serious problems and sent him to the Vacaville Medical Facility for psychotherapy. His therapist was a woman who was a student at Berkeley, and, according to defendant, he had sexual relations with her while still in prison.

At the age of 20 he was paroled with $100 and a set of clothes. He had no job and no friends. He became sexually involved again with the prison therapist.

After five months on the street he committed, and, after confessing, was convicted of, rape. He was returned to prison at Vacaville for seven years, during which time he had to fight off many knife attacks. When released he was 27 and still had the same problems: no job skills and no place to go.

After five months, he deliberately—as an "act of self-destruction"—raped four women. He blindfolded the first two victims, but then he became less

cautious; he just did not care. He turned himself in because he could not deal with his problems.

He was sent to San Quentin Prison where, for the first few years, he tried to destroy himself by placing himself in situations in which he could be stabbed. When he was 29 he met a psychologist who persuaded him he could overcome his problems. He began therapy and entered a computer data processing program from which he graduated, and was scheduled for parole.

He received time off for good behavior, and worked hard to learn productive skills. He started painting. Because there was no one in prison to teach him, he learned on his own and painted on glass.

Some of the paintings depicted violent and sexual scenes. Defendant testified that the subject matter of his painting was not chosen because it depicted violence, but because the original artist whose paintings he copied (Frank Frazetta) was "very good," and he (defendant) used those paintings as models from which to learn. Also, he explained, he painted these kinds of pictures because of where he was—i.e., other men in prison wanted them.

After having two of his paintings displayed to the jury, defendant explained the technique he had used in producing them. There were two pieces of glass to the painting, a front and back. The figures on the back piece were painted right side up, as one would normally write. The front piece, however, was painted completely in reverse, and then mounted to the back. In producing the paintings he used gold and silver leaf, acrylics, glass stain, and a compressor to spray lacquers. He described it as a slow, painstaking technique.

Defendant testified he had completed over 90 paintings and sold them all. He claimed he had also won ribbons in every art show he had entered and, out of 2,000 applicants in the Governor's Art Show, he had won first prize and had been awarded a semester scholarship at the San Francisco Art Academy.

After accomplishing these things, and also completing high school and a year of college—all while he was still in prison—defendant said he had wanted a girlfriend. In 1978, when they were both in prison, he began writing to Dixie Wallace. They planned for two years to get out of prison and be together. He felt that with his paintings and new found artistic skill, they could make it.

He sent Dixie money while she was in prison. He was selling his paintings for about $500 each. Dixie was paroled in 1979 and began visiting him. He sent her money for her car and for Christmas presents for her daughter.

He left prison with five paintings that he placed in art galleries. Two months later, he and Dixie were broke. He was in debt for car payments and rent, and had no job. His paintings were selling, but slowly. And, he told the jury, he argued with Dixie: "I fought not to commit a robbery, I fought not to rob, not to steal."

Defendant testified that although the story he had relayed to the jury was a sad one, he did not mean to elicit sympathy or a verdict of life in prison without possibility of parole, because he believed that sentence to be cruel and inhumane.

He explained why he wanted a death sentence. His first reason concerned the problems he would have to face in prison if given a life sentence, and in particular, problems with Ben Goss, the brother of Linda Rogers, the woman whom he had been convicted of murdering. Based on his 15 years experience in prison, he believed that in prison either he would have to stab Ben Goss, or be stabbed by him.

His second reason was that, as he viewed it, he had wasted his life, and he saw nothing "productive" to do in prison "except fighting and violence, which [had] been [typical of his] last 15 years."

His third reason was that he could not "bear being alone anymore." Out of the previous 23 years, he had been incarcerated for 19. His final reason was that he did not "care to live with the memory of Dixie Jean Wallace."

During cross-examination, the prosecutor elicited defendant's admissions that, in addition to the various offenses referred to in his direct testimony, he had also committed as a juvenile two other burglaries or attempted burglaries and that on each occasion he had a knife in his possession.

## II. GUILT PHASE ISSUES

### A. *Vicinage Jury*

▇ Defendant contends he was deprived of his right, under both the federal and state Constitutions, to be tried by a jury drawn from the area (vicinage) where the crime was allegedly committed. He argues this right is fundamental, and cannot be waived by an attorney over a client's objection. He asserts he was deprived of this right when his attorney's motion for change of venue was granted over his objection.

The venue motion was made and ultimately granted on the statutory ground that there was a "reasonable likelihood that a fair and impartial trial

[could not] be had in [Stanislaus] county." (§ 1033, subd. (a).)[2] Counsel successfully argued that pretrial publicity had prejudiced potential jurors against defendant. Defendant personally opposed the venue change and requested that his counsel be discharged. The court held an in camera hearing to rule on that request, and defendant testified he did not want a change of venue and believed he could have a fair trial in Stanislaus County.

■ Before addressing defendant's argument, it should be explained that venue and vicinage are logically distinct concepts. Venue refers to the location where the trial is held, whereas vicinage refers to the area from which the jury pool is drawn. (Kershen, *Vicinage* (1976) 29 Okla.L.Rev. 801, 805.) It is possible in theory to change one but not the other. (See, e.g., *State of Maryland* v. *Brown* (D.Md. 1969) 295 F.Supp. 63, 79, 82.) From the parties' point of view, different reasons may affect a choice of venue and a choice of vicinage. Venue in the place where the crime was committed promotes the convenience of both parties in obtaining evidence and securing the presence of witnesses. A jury drawn from the vicinage of the crime means that the case will be tried by persons more likely to be familiar with the accused, the witnesses, and local customs and manners. (*Kershen, supra,* at pp. 833-835.)

Normally, the choice of venue determines vicinage. (See, e.g., *People* v. *Barney* (1983) 143 Cal.App.3d 490, 493-494 [192 Cal.Rptr. 172].) Section 1033 clearly reflects an assumption that jurors will be drawn from the community where the trial is held; that is, vicinage will change with venue.

Defendant's comments at the in camera hearing do not make clear whether his interest was in venue in Stanislaus County or in a vicinage jury. On appeal, however, he clearly argues his vicinage right, and the People concede the issue was properly preserved below.

The federal vicinage right is based on the Sixth Amendment to the United States Constitution, which provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."

In *Williams* v. *Florida* (1970) 399 U.S. 78 [26 L.Ed.2d 446, 90 S.Ct. 1893], the United States Supreme Court considered which aspects of the

---

[2]Section 1033, subdivision (a) provides: "In a criminal action pending in the superior court, the court shall order a change of venue: [¶] (a) On motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county . . . ."

The trial court initially denied the motion for change of venue. Counsel sought and obtained writ relief from the Court of Appeal, which directed the trial court to grant the motion. The trial was held in El Dorado County.

common law jury trial procedure had been made mandatory for the states through the Sixth and Fourteenth Amendments. Some features, the court held, were not constitutionally mandated, because the framers had declined to require all the "accustomed requisites" of a jury in the language of the Sixth Amendment.

Nevertheless, *Williams* held, the vicinage right was guaranteed by the Sixth Amendment because it was expressly mentioned therein. (399 U.S. at p. 97 [26 L.Ed.2d at p. 458].) Following *Williams* in *People* v. *Jones* (1973) 9 Cal.3d 546 [108 Cal.Rptr. 345, 510 P.2d 705], we found it "abundantly clear the 'vicinage' requirement as stated in the Sixth Amendment, namely trial by a jury of the district wherein the crime shall have been committed, is an essential feature of jury trial preserved . . . by the Sixth Amendment and made binding upon the states by the Fourteenth Amendment." (*Id.*, at p. 551.)

Long before *Williams* and *Jones* were decided, this court had reached the same conclusion about the vicinage right under the California Constitution, using a different route. *People* v. *Powell* (1891) 87 Cal. 348 [25 P. 481], found that former article I, section 7[3] secured for Californians all features of the right to jury trial that existed at common law. *Powell* noted, "[t]he [vicinage] right is one that has always been regarded as of great importance, and has been preserved and continued in force by the constitution of the United States, and perhaps by the constitutions of every state in the Union." (*Powell, supra,* 87 Cal. at p. 360.) *Powell* concluded that the vicinage right was incorporated into the California Constitution.

The mere fact that vicinage is an essential feature of the federal right to jury trial as well as an aspect of the state constitutional right does not answer the question whether it may be waived by counsel. ▮ "In general, it is well established that the power to control judicial proceedings is vested exclusively in counsel. [Citations.] . . . [¶] Counsel's control, of course, is not unlimited, and there are *certain fundamental protections* guaranteed an accused *which counsel may not waive without his client's concurrence.* [Citations.]" (*Townsend* v. *Superior Court* (1975) 15 Cal.3d 774, 781 [126 Cal.Rptr. 251, 543 P.2d 619], italics added.)

▮ The accused's concurrence in a waiver of the right to a jury trial is so critical that we have required an express statement of waiver on the record. (*People* v. *Holmes* (1960) 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583].) ▮ An express personal waiver is also required for the constitu-

---

[3]Former article I, section 7 read: "The right of trial by jury shall be secured to all, and remain inviolate." Present article I, section 16 provides that "[t]rial by jury is an inviolate right and shall be secured to all . . . ."

tional rights inherent in a plea of guilty and waiver of a jury trial—the right of confrontation, the right not to incriminate oneself, and the general right to present a defense. (*In re Tahl* (1969) 1 Cal.3d 122, 132-133 [81 Cal.Rptr. 577, 460 P.2d 449].) Counsel's waiver, however, is assumed to reflect his client's assent in the absence of an express objection when other "fundamental" rights are involved. (E.g., *People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710] [defendant's insistence on testifying over his counsel's objections]; see generally *In re Tahl, supra,* 1 Cal.3d at p. 133 ["We have no doubt that in the course of trial a waiver of constitutional rights may be implied and need not necessarily be preceded by a full explanation of each right and its consequences"].)

These cases provide examples of those fundamental rights that require express waiver by the accused and those that do not, but they fail to set forth the criteria for deciding what other rights belong in which category. It is clear, however, that we may not reject defendant's contention that the vicinage right is personal on the ground that its exercise is typically harmful to the defense. It appears that certain decisions may belong to the client even though the attorney is better equipped to decide wisely, and even though his own decision may be against his best interests.[4]

Defendant's argument must be rejected, however, because the historic nature and purpose of the vicinage right indicates it is not a personal one. The right does not exist to safeguard an accused's right to be treated with dignity as an individual, as does the right to present a defense or the right to a speedy trial. Nor does it exist exclusively to ensure a fair trial, like the right to a jury trial or to counsel. The rule that crimes are tried in the community where they occurred, by jurors drawn from that community, protects the interests and rights of the community as well.

This is not to minimize the importance of a trial in the vicinage in protecting the accused's constitutional rights. As *Williams, supra,* 399 U.S. 78 [26 L.Ed.2d at p. 449], and *Jones, supra,* 9 Cal.3d at page 551, recognized, the vicinage right is historically important in preventing governmental oppression.[5] Yet, it is clear that the vicinage right belongs to the commu-

---

[4]See *Faretta* v. *California* (1975) 422 U.S. 806, 834 [45 L.Ed.2d 562, 581, 90 S.Ct. 1893]; see also *People* v. *Joseph* (1983) 34 Cal.3d 936 [196 Cal.Rptr. 339, 671 P.2d 843]; *People* v. *Robles, supra,* 2 Cal.3d 205, 215, footnote omitted; *People* v. *Frierson* (1985) 39 Cal.3d 803, 815-816 [218 Cal.Rptr. 73, 705 P.2d 396].

[5]In fact, the English practice of transporting colonists to England for trial " 'was one of the grievances which led to the separation of the American colonies from the British empire.' " (*People* v. *Powell, supra,* 87 Cal. at p. 359.) Among the grievances listed in the Declaration of Independence was "transporting us beyond seas to be tried for pretended offenses . . . ." The right certainly was fresh in the minds of the framers when the Sixth Amendment was drafted. (*Kershen, supra,* 29 Okla.L.Rev. at pp. 805-808.)

nity as well as to the accused. It vindicates the community's right to sit in judgment on crimes committed within its territory. "Local communities, through their juries, [are] thereby [ ] able to 'make' the criminal law for their community. Local responsibility for setting community standards, for defining what conduct [is] considered criminal within that community, [is] encouraged." (Kershen, *supra,* 29 Okla.L.Rev. at p. 839.) "As a result, where jurors act[ ] as the conscience of the community, they would be reflecting the conscience of their own community, however large, rather than the conscience of a community unaffected by the crime." (*Id.,* at p. 843.)

A trial in the vicinage may have a legitimizing effect on jury verdicts. "It is suggested that participation in judicial decisionmaking by representatives of the community increases the likelihood that the resulting decision will be seen as fair and just." (Note (1974) 62 Cal.L.Rev. 408, 542.) It has also been urged that "maintaining criminal trials in the locus of the crime serves significant therapeutic needs of the community. . . . Trials in the community of local criminal matters, particularly shocking crimes, provide a substitute for the natural human reactions of outrage, protest and some form of vengeful self-help." (Murphy, *Revising Domestic Extradition Law* (1983) 131 U.Pa.L.Rev. 1063, 1087.)

■ Our law still recognizes this right of the citizenry to have the trial of crimes committed in their community held in that community. An accused may have his case tried elsewhere if his right to a fair and impartial trial is threatened. He may not change venue merely as a convenience. Absent a showing that there is a reasonable likelihood of an unfair trial, a community retains the right to try its own crimes.[6]

■ Accordingly, we conclude the vicinage right is not a personal one. A change of venue to ensure a fair trial, even over an accused's objections, does not threaten " 'that respect for the individual which is the lifeblood of the law.' " (*Faretta, supra,* 422 U.S. at p. 834 [45 L.Ed.2d at p. 581].) Nor does the right exist solely to protect fair and impartial factfinding. Its waiver, pursuant to the provisions of section 1033, subdivision (a), is a tactical matter within counsel's power to control.

*People* v. *Ames* (1975) 52 Cal.App.3d 389 [124 Cal.Rptr. 894], does not compel a contrary result under the state Constitution. *Ames* held that a waiver of the right to be tried by 12 jurors rather than a lesser number was

---

[6]Section 1033, subdivision (b), provides that venue may be changed by motion of any party, or by the court itself, "to an adjoining county when it appears as a result of the exhaustion of all of the jury panels called that it will be impossible to secure a jury to try the cause in the county."

not valid unless personally made. Noting that our state Constitution requires personal waiver of a jury trial, *Ames* reasoned the state constitutional right to a jury trial "is the right as it existed at common law at the time the constitution was adopted. [Citations.] The common law jury consisted of 12 persons. [Citations.] Thus, a defendant's consent to be tried by less than 12 persons must be as formal as a waiver of the entire jury." (*Id.*, at p. 392.) Defendant argues the vicinage right also existed at common law, and therefore under *Ames* its waiver "must be as formal as a waiver of the entire jury."

Unlike the 12-person jury, the vicinage feature does not appear to have been an absolute one at common law. In this respect, several state courts have disagreed with the broad holding of *People* v. *Powell, supra,* 87 Cal. 348, that the vicinage right existed at common law and, therefore, was not subject to any modification by court or Legislature without the consent of the defendant. (*Id.*, at pp. 354-360.) These courts have concluded that even at common law, the vicinage right was conditioned on the possibility of a fair trial in the place in which the crime was committed. (See, e.g., *State* v. *Steward* (1958) 74 Nev. 65 [323 P.2d 23]; *State* v. *Miles* (1926) 43 Idaho 46 [248 P. 442]; *State* v. *Lewis* (1906) 142 N.C. 626 [55 S.E. 600, 603]; Comment, *Change of Venue in California Criminal Trials* (1956) 44 Cal.L.Rev. 108, 111; Note, *Change of Venue by Prosecution* (1937) 10 So.Cal.L.Rev. 506, 507; see generally, Annot., Change of Venue by State in Criminal Case (1972) 46 A.L.R.3d 295.)

Even in this state, *Powell's* holding (*supra,* 87 Cal. 348) that the vicinage right is an absolute one has been called into question. It has been held that "[u]nder our Constitution the venue of any offense committed within the state is subject to legislative determination . . . ." (*Jackson* v. *Superior Court* (1970) 13 Cal.App.3d 440, 443 [91 Cal.Rptr. 565, 46 A.L.R.3d 290], citing *People* v. *McGowan* (1932) 127 Cal.App. 39, 43 [14 P.2d 1036].)

This legislative power is of course subject to federal constitutional restraints. (*People* v. *Barney, supra,* 143 Cal.App.3d 490, 493-494.) It is unnecessary to decide here whether the state Constitution, incorporating the common law, imposes additional and independent restraints. It suffices to say that a change of venue on the defendant's motion, based on a showing of likely unfairness, is factually distinguishable from *Powell, supra,* 87 Cal. at pages 350-353. Indeed, statutory authorization for a change of venue on a defendant's motion was enacted by the Legislature shortly after the Constitution was adopted and remains unchallenged. (Stats. 1850, ch. 119, § 330; Stats. 1851, ch. 29, § 312.)

Accordingly, we conclude that a waiver of vicinage, in the form of a motion for a change of venue, is not governed by *Ames, supra,* 52

Cal.App.3d 389. Such a waiver does not relinquish a fixed feature of a common law jury and need not be personally made.

B. *Inadmissible Opinion Evidence and Improper Argument*

■ Defendant asserts it was error to permit the District Attorney of Stanislaus County, Donald Stahl, to testify as a witness for the People that he offered Dixie Wallace immunity from prosecution because he believed she was innocent of any crime. Defendant further contends this error was compounded by the prosecutor's argument to the jury that Wallace's immunity agreement had been approved by a judge.

Wallace was an important prosecution witness. She testified that (i) she and defendant argued about money on August 1; (ii) defendant asked her if he should "do a robbery"; (iii) immediately after the argument defendant took a butcher knife from the kitchen and left in his car; (iv) he returned around 7 p.m. that day admitting he had committed a murder; (v) he tried to give Wallace some money; (vi) he took a baseball bat from his car and washed it under the sprinkler; (vii) he burned the checks stolen from the Treehouse and pieces of blue material used to tie Rogers; and (viii) he forced Wallace at knife point to drive him back to the orchard to look for and destroy evidence.

The defense cross-examination of Wallace sought to establish that she had a strong incentive to testify favorably for the prosecution because she had received many favors concerning her own criminal cases. At the time of the Rogers murder, she was on parole following a prison term for robbery and escape. She was also on misdemeanor probation for resisting arrest. As a condition of probation, she was required to serve weekends on a work assignment. She had missed several weekends at the time she called law enforcement authorities to report defendant's involvement in the Rogers murder. Following that call, her probation was terminated notwithstanding the missed weekends.

Later in 1980, Wallace was charged with welfare fraud. She was allowed to plead guilty to a misdemeanor charge and was expected to serve 30 days in the county jail following defendant's trial.

The defense also questioned Wallace about her immunity agreement with the district attorney's office. It was brought out that she understood she could not be prosecuted either as a principal or as an accessory for the events of August 1.

Following Wallace's testimony, the prosecutor called District Attorney Stahl to explain why he had offered her immunity. Stahl testified that he

had personally prosecuted the case through the preliminary hearing stage, and that he thought Wallace's evidence would be instrumental in obtaining a conviction. He further testified that he offered Wallace total immunity, even though some might interpret her conduct as aiding defendant after the murder. He testified that from reading the reports and from talking to Wallace he believed that any aid she had given defendant had been coerced, and he did not believe she was either a principal or an accessory.

The defense objected to Stahl's testimony as inadmissible opinion evidence. The court overruled the objection, reasoning that because Wallace had been cross-examined about immunity the prosecution was entitled to explain why immunity had been granted.

After this ruling, defense counsel asked the court for a limiting instruction informing the jury that Stahl's testimony "goes only as to his state of mind and does not affect the determination of the facts." The court gave the following instruction at the close of Stahl's testimony: "Ladies and gentlemen of the jury, the witness has just testified that in his opinion as the chief law enforcement officer of Stanislaus County that Dixie Wallace was not a principal in the crimes before the Court; that is, the murder, the robbery, the rape, and the kidnap. [¶] That may well be an issue for you to decide as a factual matter during your deliberations. I am not saying it will be, but it may be. [¶] If that is true, you must accept Mr. Stahl's testimony simply as to what he went through in the weighing process as to whether or not he should afford Dixie Wallace an immunity by requesting that the Court grant immunity. [¶] It is simply in that context that this testimony can be taken. It cannot be taken as an expert's view and you should accept it as his view as to whether or not Dixie Wallace was a principal in the crimes or not."

The prosecutor returned to this issue in his closing argument. Over objection by the defense, the prosecutor tied together Stahl's views with those of the judge who had accepted the immunity agreement: "[A]nother aspect is that of immunity, which I mentioned to you before. Don Stahl came here and testified about why he gave immunity to Dixie Wallace at the preliminary hearing . . . . Also, when she was given immunity at the preliminary hearing, it was accepted by a court, a court of law, a judge. Also, when the weekends and the misdemeanor probation were rescinded by Don Stahl going in on her behalf, he went to a judge. As the letter indicates, as he testified to, another judge in a court of Stanislaus County accepted that from the District Attorney's office."

Defendant asserts Stahl's testimony was inadmissible and should have been excluded for two reasons. First, he claims it was irrelevant: Whereas

*Wallace's* understanding of the immunity agreement and the reasons why it was offered would bear on her bias in testifying, *Stahl's* understanding of the agreement was beside the point.

More importantly, defendant asserts, Stahl's evidence was the functional equivalent of an expert opinion on the credibility of a witness, and the prosecutor's closing argument aggravated the error and amounted to vouching in the classic sense of that term. (See, e.g., *People* v. *Brown* (1981) 116 Cal.App.3d 820, 828 [172 Cal.Rptr. 221]; *People* v. *Sergill* (1982) 138 Cal.App.3d 34, 39 [187 Cal.Rptr. 497]; *United States* v. *Roberts* (9th Cir. 1980) 618 F.2d 530, 532-536; *United States* v. *Brown* (9th Cir. 1983) 720 F.2d 1059, 1072-1073.)

Defendant may well raise meritorious objections, but assuming error, and assuming the court's limiting instruction was insufficient to cure the testimonial error, reversal is not required. As shown by the facts set out *ante,* pages 926-928, the case against defendant was very strong, and the defense evidence was implausible. Moreover, Wallace's testimony was solidly corroborated by the tape of her telephone conversation with defendant. Accordingly, we conclude it is not reasonably probable that the errors affected the outcome. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

C. *Defendant's Narrative Testimony*

Defense counsel informed the court, outside the jury's presence, that defendant would testify against his advice and that the "free narrative" approach would be used during direct examination. The court advised defendant that (i) he should follow his attorney's advice and not testify, (ii) his testimony would be subject to evidentiary objections under the same rules of evidence as any other witness and that he was ill-equipped to handle those objections because of his inexperience in law, (iii) his failure to testify would not cure any failure by the People to prove essential elements of the crimes charged beyond a reasonable doubt, and (iv) he had a constitutional right not to testify and no adverse inference could be drawn from his decision to exercise that right.

When defendant still insisted on testifying, the court further instructed him as follows: (i) if he had any prior felonies bearing on his credibility, the prosecution could use them to impeach him, (ii) the court would instruct the jury on how to weigh the credibility of a witness, (iii) the court would be inclined to instruct the jury that an adverse inference can be drawn against a defendant if he fails to explain or deny any evidence against him introduced by the prosecution that he can reasonably be expected to deny or explain (CALJIC No. 2.62), and (iv) defendant's attorney would have an

ethical obligation not to argue to the jury anything in defendant's testimony that the attorney believed was untrue.

Defendant nonetheless testified. He stated he was not at the Treehouse Boutique at the time of the murder, but instead was drinking beer and smoking marijuana by himself. Defense counsel briefly participated in the direct examination to establish (i) defendant's identity, (ii) his recollection of the events of August 1, 1980, (iii) that defendant made no telephone calls to Wallace between August 2, 1980, and the date of his apprehension by the police, and (iv) that defendant was not the person heard on the tape recording of the telephone call that was played to the jury. Defendant's testimony was consistent with the defense theory that Wallace had committed the murder and had devised a scheme to blame it on him.

In closing argument, lead counsel did not mention this testimony. Defendant's second counsel (see *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]) observed that defendant testified he was drinking beer and smoking marijuana near the Gardners' house at the time the murder occurred.

■ Defendant argues he was denied effective assistance of counsel when he was forced to use the free narrative approach. He asserts counsel improperly failed to elicit his version of the facts, and claims that questions from counsel would have ensured a more complete and coherent presentation.[7] Further, he argues, his attorney-client privilege was violated. Finally, he claims his attorney's approach was the product of a conflict of interest resolved against him.

The United States Supreme Court recently considered the question of whether an attorney's refusal to assist his client in presenting testimony the attorney believes to be perjured constitutes ineffective assistance of counsel. (*Nix* v. *Whiteside* (1986) 475 U.S. 157 [89 L.Ed.2d 123, 106 S.Ct. 988].) That case does not entirely resolve the situation here, because the attorney in *Whiteside* adopted a different course of conduct: He dissuaded his client from testifying to a particular version of the facts by threatening to reveal to the court that the story was perjured. He also threatened to withdraw from representation and to impeach his client if the latter testified falsely. The client thereupon took the stand and related facts that the attorney believed to be true. The attorney evidently examined his client in the conventional manner and argued his testimony to the jury.

[7]For example, defendant's direct testimony omitted the fact that he and Wallace discussed committing a robbery on the morning of August 1, 1980. When he was cross-examined on this point, he maintained that the omission was not intentional.

*Whiteside* held the attorney's threat of disclosure did not deny his client effective assistance of counsel. The court found the attorney's representation fell "well within accepted standards of professional conduct and the range of reasonable professional conduct acceptable under *Strickland* [v. *Washington* (1984) 466 U.S. 668 (80 L.Ed.2d 674, 104 S.Ct. 1052)]." (*Whiteside, supra,* 475 U.S. at p. 171 [89 L.Ed.2d at p. 137, 106 S.Ct. at p. 997].) The court reasoned that the client was not forced to choose between his right to testify and his right to counsel, because he had no right to testify falsely. (*Id.,* at p. 172 [89 L.Ed.2d at p.138].) Nor did the attorney improperly threaten a disclosure of client confidences: "An attorney's duty of confidentiality, which totally covers the client's admission of guilt, does not extend to a client's announced plans to engage in future criminal conduct." (*Id.,* at p. 172 [89 L.Ed.2d at p. 139].)

Five members of the *Whiteside* court agreed that the American Bar Association's Model Code of Professional Responsibility and the Model Rules of Professional Conduct *require* counsel to disclose client perjury if the client cannot be dissuaded from committing perjury. (475 U.S. at p. 171 [89 L.Ed.2d at p. 137, 106 S.Ct. at pp. 996-997].)

Writing separately, Justice Blackmun, joined by three other justices, argued it was beyond the province of the court to dictate what counsel must do in this situation. As even the majority agreed, the court "must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the State's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts." (*Id.,* at p. 165 [89 L.Ed.2d at p. 134, 106 S.Ct. at p. 994].)

Concurring in the judgment, Justice Brennan "read this as saying in another way that the Court *cannot* tell the states or the lawyers in the states how to behave in their courts, unless and until federal rights are violated . . . . [¶] [T]he Court's essay regarding what constitutes the correct response to a criminal client's suggestion that he will perjure himself is pure discourse without force of law." (*Id.,* at p. 177 [89 L.Ed.2d at p. 141, 106 S.Ct. at p. 1000].)

All nine justices agreed, however, that the course actually followed by the attorney in *Whiteside* did not constitute ineffective assistance of counsel. The entire court agreed that the client's right to present a defense was not impaired, because there is no legally cognizable right to testify perjuriously. The court also agreed that the attorney's actions were consistent with his ethical obligations as an officer of the court to refuse to suborn perjury and

did not create a prejudicial conflict of interest depriving the client of his Sixth Amendment right to counsel.

We agree *Whiteside* does not dictate the course that must be followed by a California lawyer who believes his client is lying or will do so on the stand. Nor does anything in the California Rules of Professional Conduct prohibit the course followed here. Accordingly, our inquiry, as in *Whiteside,* must be whether the course actually followed resulted in a denial of defendant's Sixth Amendment right to the effective assistance of counsel.

Counsel's conduct in this case closely followed that formerly prescribed by the American Bar Association (ABA) Project on Standards for Criminal Justice, Standards Relating to the Defense Function (Approved Draft 1971) standard 7.7.[8] The standard recognizes that, although counsel need not elicit what he thinks will be perjured testimony, an accused has an absolute right to testify over counsel's objection. (*People* v. *Robles, supra,* 2 Cal.3d at p. 215.) Nothing in *Whiteside* condemns the free narrative approach as amounting to ineffective assistance of counsel, even though it appears that

[8] Former standard 7.7, designed to be compatible with the ABA Code of Professional Responsibility, stated: "Testimony by the defendant. [¶] (a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishes that the admissions are true but the defendant insists on his right to trial, the lawyer must advise his client against taking the witness stand to testify falsely. [¶] (b) If, before trial, the defendant insists that he will take the stand to testify falsely, the lawyer must withdraw from the case, if that is feasible, seeking leave of the court if necessary. [¶] (c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises during the trial and the defendant insists upon testifying falsely in his own behalf, the lawyer may not lend his aid to the perjury. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer must confine his examination to identifying the witness as the defendant and permitting him to make his statement to the trier or the triers of the facts; the lawyer may not engage in direct examination of the defendant as a witness in the conventional manner and may not later argue the defendant's known false version of facts to the jury as worthy of belief and he may not receive or rely upon the false testimony in his closing argument."

Standard 7.7 was not included in the 1980 second edition of the ABA Standards for Criminal Justice (hereafter ABA Standards). The editorial note to that edition explained, "the question of what should be done in situations dealt with by the standard has been deferred until the ABA Commission on Evaluation of Professional Standards reports its final recommendations." In the 1983 Model Rules of Professional Conduct, standard 7.7 was rejected by rule 3.3 (lawyer has duty to disclose falsity of evidence, even if disclosure compromises client confidences.) (See ABA Standards, *supra,* (1986 Supp.) pp. 4.23S-4.25S; *Whiteside, supra,* 475 U.S. at p. 170, fn. 6 [89 L.Ed.2d at p. pp. 136-137, 106 S.Ct. at p. 996].)

California has not adopted any rule patterned on model rule 3.3. As the ABA's Editorial Note to standard 7.7 observes, some courts continue to endorse that standard's recommended procedures. (ABA Standards, *supra,* (1986 Supp.) at p. 4.25S; see *Lowery* v. *Cardwell* (9th Cir. 1978) 575 F.2d 727; *State* v. *Fosnight* (1984) 235 Kan. 52 [679 P.2d 174]; *Matter of Goodwin* (1983) 279 S.C. 274 [305 S.E.2d 578]; *Coleman* v. *State* (Alaska 1980) 621 P.2d 869; *People* v. *Salquerro* (1980) 107 Misc.2d 155 [433 N.Y.S.2d 711].)

the high court does not look favorably on that procedure. (See *Whiteside, supra,* 475 U.S. at pp. 170-171 & fn. 6 [ 89 L.Ed.2d at pp. 136-137, 106 S.Ct. at pp. 996-997].)

Defendant cites *Ferguson* v. *Georgia* (1961) 365 U.S. 570 [5 L.Ed.2d 783, 81 S.Ct. 756], *Johns* v. *Smyth* (E.D. Va. 1959) 176 F.Supp. 949, and *Lowery* v. *Cardwell, supra,* 575 F.2d 727, in support of his argument that his counsel's course of action denied him effective assistance of counsel. None of these cases supports the conclusion he would have us draw. In *Ferguson,* the high court held that a state statute which could prevent counsel from asking the accused any questions on direct examination violated due process. In the present case, however, no statute dictated counsel's conduct. Rather, that conduct was counsel's best effort to reconcile their duty of representation with their ethical obligations as officers of the court.

In *Johns,* the federal court set aside a conviction after describing the petitioner's state trial as a virtual ex parte proceeding in which no jury instructions or closing arguments were presented on his behalf. (176 F.Supp. at pp. 952-953.) The court stated, "[i]f petitioner had been without the services of an attorney, but had remained mute, it is unlikely that he would have been worse off." (*Id.,* at pp. 953-954.) Here, in contrast, counsel presented a vigorous defense. They called numerous witnesses on defendant's behalf, argued the testimony of all other defense witnesses, and elicited various favorable jury instructions from the trial judge.

In *Lowery,* a federal court set aside a state conviction in which the trial counsel had moved to withdraw immediately after his client testified. Counsel also failed to argue his client's version of the facts to the court, which was the trier of fact. The court of appeals found these actions deprived the defendant of a fair trial, because they constituted an unequivocal announcement to the fact finder that the attorney disbelieved his client. (575 F.2d at p. 730.)

The *Lowery* court continued, however: "[I]t does not follow from our holding that a passive refusal to lend aid to what is believed to be perjury in accordance with the [ABA] Defense Function Standards would violate due process. In our view, mere failure to pursue actively a certain course of defense, which counsel ethically is precluded from actively pursuing, cannot be said to constitute denial of fair trial. While a knowledgeable judge or juror, alert to the ethical problems faced by attorneys and the manner in which they traditionally are met, might infer perjury from inaction, counsel's belief would not appear in the clear and unequivocal manner presented by the facts here. . . . [I]n the weighing of competing values in which we are engaged . . . the integrity of the judicial process must be allowed to

play a respectable role; the concept of due process must allow room for it. [¶] The distinction we draw is between a passive refusal to lend aid to perjury and such direct action as we find here—the addressing of the court in pursuit of court order granting leave to withdraw. By calling for a judicial decision upon counsel's motion in a case in which the judge served as fact finder, this conduct affirmatively and emphatically called the attention of the fact finder to the problem counsel was facing." (*Id.*, at p. 731.)

Defendant contends his jury had clear notice that his counsel did not believe him. He notes that his counsel participated in and argued the testimony of the other six defense witnesses, that the trial judge commented on defendant's use of the narrative form in the jury's presence, and that the prosecutor argued that defendant took the stand at his own insistence. None of this, however, is inconsistent with the jury surmising that defendant desired to testify unhampered by the traditional question and answer format. In fact, defendant's testimony was presented in as clear and coherent a fashion as that of other witnesses. Unlike *Lowery*, counsel's conduct in no way signalled to the jury that they disbelieved their client.

█ Finally, defendant argues the narrative approach forced him to represent himself in the presentation of his own testimony. He asserts he was deprived of a fair trial because the court did not inform him of all the dangers of this limited self-representation, and that his decision to proceed with the free narrative was not knowing and intelligent. Specifically, he contends that by using the free narrative he waived his right to counsel, but that the waiver was neither knowing nor intelligent because the court did not inform him that the jury was likely to infer he was lying.

This argument also fails. Defendant was "forced" to represent himself only with respect to his own direct testimony. Counsel was available for and participated in all other stages of the trial. Therefore, it was not necessary that the trial court's warnings about the dangers of self-representation be as complete as would be necessary for a defendant who sought to conduct his entire defense. More important, the court expressly advised defendant of the dangers of the free narrative approach. Defendant understood the dangers and had time to consider them before he insisted on testifying. Because of the limited nature of his self-representation and the ample warnings given, it was unnecessary for the court to have warned him further that the jury might infer he was lying.

### D. *Prosecution's Comment on Defendant's Testimony*

█ In arguing Linda Spinelli's identification testimony to the jury, the prosecutor made the following comments: "The man seated here in

court looks very much like the man at the Treehouse. Coincidentally, it happens to be the same man who is in the car with all the fiber evidence. [¶] It also coincidentally happens to be the same man that is on the tape recording, and it also happens to be the same man who has copped out or confessed or gave statements to Peggy Foster. It also happens to be the same man that has given the same information to Dixie Wallace. It happens to be the same man who was arrested and says, 'and rape, too.' It also happens to be the same man when he got up here on the witness stand at his insistence one major inconsistency [*sic*]. We will get to that in a few moments."

Defendant contends it was misconduct for the prosecutor to comment on his exercise of his right to testify. In *Griffin* v. *California* (1965) 380 U.S. 609, 614 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229], the United States Supreme Court held prosecutorial comment on an accused's right *not* to testify violates the accused's Fifth Amendment privilege against self-incrimination because it imposes a penalty on the exercise of that right. Similarly, courts have held prosecutorial comment on the accused's hiring of an attorney violates the Sixth Amendment right to counsel. (See, e.g., *People* v. *Schindler* (1980) 114 Cal.App.3d 178, 187-189 [170 Cal.Rptr. 461]; cf. *United States* v. *Vargas* (7th Cir. 1978) 583 F.2d 380, 388.)

Defendant claims the prosecutor's comment here was misconduct because it penalized the exercise of a constitutional right to testify. He submits that under the facts surrounding his use of the narrative approach, the prosecutor's comment served to confirm the jury's likely impression that he was testifying against his attorneys' wishes because they did not believe his testimony to be true.

We do not condone any argument by the prosecution that could be construed as a charge that an accused has testified over the objection of his own lawyer. Nevertheless, no reversible error appears here for three reasons. First, when the prosecutor's comments are read in context, they do not appear to inform the jury that defendant testified against the advice of counsel. At most, the comments are ambiguous about whether defendant insisted on testifying or insisted on testifying inconsistently.

Second, there was no objection to the comment now at issue. ▮ If an admonition to the jury could have cured any possible harm from asserted prosecutorial misconduct at the argument, defendant may not raise the issue on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468].) ▮ Considering the brevity of the comment and the unlikelihood that an adverse inference would be drawn, it is appropriate to

conclude that *Green* bars defendant from raising the issue here. Finally, to the extent error occurred in this regard, it was clearly harmless.

### E. *Instruction on Jury Note-taking*

 The court allowed the jury to take notes during the trial. The court instructed the jurors as follows: "This will be a fairly lengthy trial and you may find that taking some notes is helpful to you. But, if you get so consumed in the taking of notes that you really miss the story as it's going in, then you don't observe the demeanor of the witnesses on the stand and then we think note-taking is a self-defeating effort." Defendant asserts the instruction was inadequate to minimize the danger in note-taking and that the judgment must be reversed.

Section 1137 provides that jurors may consult their notes during deliberations. Several Court of Appeal decisions have construed section 1137 as implicit statutory authorization for jurors to take notes during trial. (See, e.g., *People* v. *Cline* (1963) 222 Cal.App.2d 597, 601 [35 Cal.Rptr. 420]; *Bates* v. *Newman* (1953) 121 Cal.App.2d 800, 810 [264 P.2d 197].) No California case has required specific cautionary instructions before allowing jurors to take notes.

Trial counsel neither objected to jury note-taking nor asked for supplementary cautionary instructions. Because no objection was made at trial, defendant may not raise the issue on appeal. (*People* v. *Cline, supra,* 222 Cal.App.2d at pp. 601-602.) Moreover, we conclude that although more complete instructions would be proper on request, the instructions given in the present case were adequate. In any event, on the facts of this case, the failure to give more complete instructions cannot be deemed prejudicial. (See *People* v. *Ghent* (1987) 43 Cal.3d 739, 757-758 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Whitt* (1984) 36 Cal.3d 724, 746-748 [205 Cal.Rptr. 810, 685 P.2d 1161].)

### F. *Exclusion of Jurors Unwilling to Consider Imposing the Death Penalty*

Seven prospective jurors were excluded from serving on defendant's jury because they stated they could never vote for the death penalty. Defendant argues that exclusion of these potential jurors from the guilt phase deprived him of his state and federal constitutional rights to be tried by a jury representing a fair cross-section of the community. That contention was rejected by a majority of this court in *People* v. *Fields* (1983) 35 Cal.3d 329, 346-349 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn), 374 (Kaus, J.,

conc.); *People* v. *Ghent, supra,* 43 Cal.3d at pp. 753-754; *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

## III. SPECIAL CIRCUMSTANCE ISSUES

### A. *Carlos*

In connection with the murder conviction, the jury found as four separate special circumstances that the murder was committed while defendant was engaged in the commission, attempted commission, or flight thereafter of the felonies of burglary, robbery, kidnapping, and rape. Defendant claims the special circumstance findings and the death penalty based thereon must be set aside because the jury was not instructed that it must first find that he intended to kill his victim. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].)

We recently held in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1148 [240 Cal.Rptr. 585, 742 P.2d 1306], that *Carlos* must be overruled in light of intervening decisions of the United States Supreme Court. We find the record establishes beyond doubt that defendant was the actual killer in this case, and hence the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] is satisfied. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 390-391 [88 L.Ed.2d 704, 719-720, 106 S.Ct. 689, 699-700].)

### B. *"Murder While Engaged in the Commission of a Rape" Special Circumstance*

Under the previous (1977) death penalty law, former section 190.2, subdivision (c)(3), established as a special circumstance that "[t]he murder was . . . *committed during the commission* or attempted commission" of five enumerated felonies. (Italics added.) ▆▆▆ In order to expand the scope of special circumstance coverage (see Ballot Pamp., argument in favor of Prop. 7, Gen. Elec. (Nov. 7, 1978) at p. 34) the voters in 1978 adopted, inter alia, section 190.2, subdivision (a)(17), which establishes as a special circumstance that "[the murder was *committed while the defendant was engaged in* or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit" one of nine enumerated felonies. (Italics added.) Defendant was charged pursuant to the 1978 law with murder "while [defendant] was engaged in the commission or attempted commission of a rape."

▆▆▆ Citing cases interpreting the phrases, "during the commission of" (i.e., the language of the 1977 law), and "in the perpetration of" (which is

generally used to describe the scope of the felony-murder rule), defendant asserts the drafters of section 190.2, subdivision (a)(17), must have intended that the new provision establish a different—and narrower—scope for felony-murder special circumstances. Specifically, defendant asserts that under the 1978 law, the felony-murder special circumstance, as charged here, requires a showing that he murdered *at the same time* he committed the rape or attempted rape (or "*no later than the moment such acts are completed*"), and that the evidence is insufficient to meet that test.

We do not interpret the statute so restrictively. First, we perceive no substantial difference between the two statutory phrases, "during the commission of," and "while engaged in the commission of." The words "during" and "while," in this context, reasonably appear to mean the same thing.

Nevertheless, defendant asserts, inclusion in the 1978 statute of the "or immediate flight after committing . . ." language must signal that the drafters intended a narrower meaning of the "while engaged in the commission of" phrase than that attributed to the "during the commission of" provision in the 1977 law. Although one Court of Appeal appears to have initially accepted this view (see *Jones* v. *Superior Court* (1981) 123 Cal.App.3d 160, 165-171 [176 Cal.Rptr. 430]), the same court apparently retreated from that interpretation in *Ario* v. *Superior Court* (1981) 124 Cal.App.3d 285 [177 Cal.Rptr. 265], in which it held that "the terms, 'while . . . engaged in' and 'during the commission of,' should carry the same meaning. (Cf. *Jones*. . . )" (*Ario, supra,* 124 Cal.App.3d at pp. 288-289.)

■ We agree with *Ario,* because defendant's alternative interpretation of the 1978 law would be unreasonable. As defendant concedes, the express purpose of the initiative by which section 190.2, subdivision (a)(17), was enacted was to expand, not to constrict, the scope of felony-murder-based special circumstances. (See Ballot Pamp., argument in favor of Prop. 7, Gen. Elec. (Nov. 7, 1978) at p. 34 [in addition to expanding coverage of the death penalty law, the proposed law "would apply to all situations which are covered by our current death penalty law"].) Not only would defendant's interpretation frustrate this purpose, it would lead to absurd results. As the People bluntly observe, "under his theory, [defendant] would not even be able to pause long enough to pull up his pants between the rape and the murder without invalidating the special circumstances. By his own terms, [defendant] would have to begin stabbing Linda Rogers while in the very act of sexual intercourse with her, or at the very moment he terminated the act, for the special circumstance to stand." We cannot ascribe such an intent to the drafters or the voters. We therefore interpret the 1978 law's phrase, "while . . . engaged in . . . the commission of" (§ 190.2, subd.

(a)(17)), as carrying a meaning no less inclusive than the 1977 law's counterpart phrase, "during the commission of" (former § 190.2, subd. (c)(3)).

■■■■ The evidence clearly supports the finding that defendant murdered "while engaged in" the commission or attempted commission of rape. We recently applied the "during the commission of" requirement in *People v. Fields, supra,* 35 Cal.3d 329, 365-368, a robbery-murder case. There the defendant, in his own house, robbed the victim with the help of a codefendant. (He compelled the victim to write a check to the codefendant, who in turn cashed the check and turned over most of the proceeds to the defendant.) Apparently the defendant forced the victim to remain in his house for a few hours after the robbery, even though the proceeds had been turned over to him. About 1 p.m., defendant, the codefendant and the victim entered a car. While the codefendant drove, defendant shot and beat the victim, killing her.

In deciding whether there existed substantial evidence that the murder occurred "during the commission of a robbery," we analyzed a number of cases, "some [of which] arise under statutes whose wording differs from the statute at issue here, [but all of which] address a problem common to this case—whether the relationship between a robbery and another crime is sufficiently close to justify an enhanced punishment." (*Fields, supra,* 35 Cal.3d at p. 365.) Reviewing those cases (*id.,* at pp. 365-367), we concluded the special circumstance finding had to be sustained.

We stated: "We recognize that when [the codefendant] returned with the proceeds of [the victim's] check and gave them to defendant, he had control over the robbery proceeds in his own residence. That residence, however, was not a place of safety so long as [the victim] was held prisoner. [Citation.] In an unguarded moment, she might escape, notify the police, and render the . . . residence quite unsafe for defendant. In order to complete a successful escape with the robbery proceeds, defendant either had to dispose of her, which he did, or flee to some other place which she could not identify for the police. Thus, the trier of fact could reasonably find that defendant's murder was a continuation of the robbery, done because until the robbery victim was killed, [defendant's] home was not a place of even temporary safety. [¶] Moreover, despite the span in space and time between the taking and the murder [citation], defendant's purpose in killing his victim serves to link the two crimes. As we noted, the record suggests two motives: to prevent her from reporting the crime [citations]; and to punish her for attempting to frustrate the robbery [citation]. Such motives would not enable a court to find a killing occurred during the commission of a robbery if it took place days later and in a far distant locale. But here the murder occurred within a few hours of the robbery, and at a site only a few

miles distant, and the events are linked not only by defendant's motives but by his continued control over the victim, forcing her to remain at his house and then transporting her to the murder site. We conclude that the evidence supports the verdict finding the special circumstance of murder during the commission of robbery." (*Fields, supra,* 35 Cal.3d at pp. 367-368.)

For the same reasons, we conclude the present record amply supports the finding that the murder occurred while defendant was "engaged in the commission" of rape. The jury could have determined the rape had not terminated so long as the victim had not been disposed of or confined. Moreover, the record shows that the murder occurred almost immediately following the rape: After the sex acts were completed the victim got up and began to walk away, at which time she was struck on the head and stabbed to death. According to the pathologist, the rape took place "probably within minutes" of the victim's death, at the same location, and with no intervening flight. We therefore conclude the evidence supports the rape special-circumstance finding.

Defendant also asserts the court erred in failing to instruct, sua sponte, on the meaning of the phrase, "while [defendant] was engaged in . . . the commission of" rape. ■■■ Of course, the court's obligation to instruct sua sponte extends only to those general principles of law "closely and openly connected with the facts before the court." (*People* v. *Robertson* (1982) 33 Cal.3d 21, 52 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

■■■ First, it is doubtful whether the above phrase is one that jurors would be unable to comprehend without amplification. In any event, we cannot conclude such an instruction was necessary here. There was no reliance on a theory that the murder did not occur while the killer was engaged in the commission of a rape. The facts before the court plainly established a murder "while [defendant was] engaged in" a rape; as defense counsel himself stated, the questions to be answered by the jury were (i) was there a rape at all, and (ii) who committed the crimes. We thus find no prejudicial error in the court's failure to instruct sua sponte on the meaning of the questioned phrase.

C. *Sufficiency of the Evidence; Burglary and Robbery Special Circumstances*

■■■ Defendant was also charged with murder "while . . . engaged in . . . the commission of, or attempted commission of, or the immediate flight after committing or attempting to commit" robbery and burglary. He asserts that under the evidence presented, only the "immediate flight"

theory, and not the "while engaged in the commission of" theory, was "arguably" supportable by the record, and that the record does not in fact support the finding.

The People, in turn, respond that there was substantial evidence that the murder was committed while defendant was in "immediate flight" from the burglary and robbery. We need not, however, decide the scope of the immediate flight provision because we believe there was sufficient evidence for the jury to conclude the murder occurred while defendant was "engaged in the commission of" the burglary and robbery.

As we have held above, we interpret the 1978 law's phrase, "while . . . engaged in . . . the commission of" (§ 190.2, subd. (a)(17)), as carrying a meaning no less inclusive than the 1977 law's counterpart phrase, "during the commission of" (former § 190.2, subd. (c)(3)).

Also as noted above, in *Fields, supra,* 35 Cal.3d 329, we analyzed the robbery-murder special circumstance in a situation analogous to that presented here. For the same reasons articulated in *Fields,* we conclude the present record amply supports the finding that the murder occurred while defendant was "engaged in the commission" of burglary and robbery. The jury could have determined that the burglary and robbery had not terminated because, until the victim was killed or otherwise disposed of or confined, defendant had not reached a place of temporary safety. Moreover, on these facts (about two hours, and fifteen miles between the burglary/robbery and the murder) we believe defendant's apparent purpose in killing the victim— i.e., to prevent her from reporting the events—serves to further link the crimes. We therefore conclude the evidence supports the burglary and robbery special-circumstances findings.

### D. *"Overlapping" Burglary/Robbery Special Circumstances*

Relying on the plurality opinion in *People* v. *Harris* (1984) 36 Cal.3d 36, 65-66 [201 Cal.Rptr. 782, 679 P.2d 433], defendant asserts the jury should not have been allowed to find at the guilt/special circumstances trial, and to consider at the penalty phase, two special circumstances (burglary-murder and robbery-murder) which arose from a single, indivisible course of conduct. We have recently considered and rejected this claim in *People* v. *Melton* (1988) 44 Cal.3d 713, 766-769 [244 Cal.Rptr. 867, 750 P.2d 741], and find no grounds here for reconsidering that issue.

### E. *Kidnapping Special Circumstance*

Defendant was charged with, and the jury found as a special circumstance, that defendant murdered while engaged in the commission or

attempted commission of a violation of section 207 (simple kidnapping). Defendant observes that the applicable special circumstance provision, section 190.2, subdivision (a)(17)(ii), requires a violation or attempted violation of sections 207 *and 209* (kidnapping for ransom or robbery). Contrary to defendant's claims, we have explained in *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755-756 [209 Cal.Rptr. 328, 691 P.2d 994], that the kidnapping special-circumstance charge based on only section 207 is not error, and that a finding of the commission of one of the two specified forms of kidnapping satisfies the statute.

## IV. PENALTY PHASE ISSUES

### A. *Witherspoon/Witt Error*

 Defendant claims his death sentence must be reversed because two prospective jurors, Dalton and Maki, were allegedly excused contrary to the rule in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], under which exclusion is proper only if a juror makes it "unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case . . . ." (*Id.*, at p. 522, fn. 21 [20 L.Ed.2d at p. 785], italics in original; *People* v. *Velasquez* (1980) 26 Cal.3d 425, 436 [162 Cal.Rptr. 306, 606 P.2d 341].) As the People point out, the United States Supreme Court has since retreated from this standard. In *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], the court "clarified" the *"proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'* We note that, in addition to dispensing with *Witherspoon's* reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved; many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." (*Id.*, at pp. 424-426 [83 L.Ed.2d at pp. 851-853],

fns. omitted, italics added, quoting *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 590, 100 S.Ct. 2521].)

We recently held in *People* v. *Ghent, supra,* 43 Cal.3d at page 767: "Because we think *Witt's* review standard and underlying rationale make good sense, and because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment, we adopt the *Witt* standard."[9] Accordingly, we will review the present record pursuant to *Witt.*

■■■■ *Prospective Juror Dalton.* After preliminary explanations about the procedures to be followed at the various phases of the trial, the court asked Dalton whether, "regardless of the evidence and because of a conscientious objection to the death penalty, [he] would, in every case, automatically vote for something other than murder in the first degree because . . . such a verdict would end the death penalty question once and for all in this case." Dalton answered essentially that although he "could weigh evidence and come to a decision as to whether or not a certain defendant perpetrated a particular act or not," he "basically [did not] believe in the death penalty, and . . . would opt for life imprisonment without the possibility of parole." After further inquiry, Dalton stated that his mind was a "closed book" on the subject "enough to prompt me to have that stand for a considerable period of time."

As the examination continued, Dalton replied "I am not sure" to the question of whether he could "conjure up in [his] mind a crime so heinous" that he would vote for the death penalty, even one which involved him personally. He also did "not think" he could vote for the death penalty for Charles Manson were he on Manson's jury. The court then asked whether Dalton would vote in every case, regardless of the evidence, against the death penalty itself, and never vote for a death verdict, to which he replied, "I believe so. I would vote for life without the possibility of parole." Additional voir dire conducted by the prosecutor and defense counsel yielded similar responses.

*Prospective Juror Maki.* When asked by the court if she would in every case, regardless of the evidence, vote for life imprisonment, and never vote for the death penalty, Maki answered, "yes, I believe I would." When the court repeated the question "you would automatically vote for life imprisonment?" she stated "I think so." When asked if she could conjure up a

---

[9] We ultimately held in *Ghent* that exclusion of the jurors in that case was proper under both *Witt, supra,* 469 U.S. 412, and the more exacting *Witherspoon, supra,* 391 U.S. 510, standards. (43 Cal.3d at pp. 767-768.)

crime so heinous that she would vote for death, she replied, "I don't think so, regardless of the crime." She finally stated she did "not believe" she could vote for death in a Manson-type case and did "not think" she could do so even if a member of her family were murdered.

Later, under questioning by the prosecutor, Maki said her "feelings [were] strong," but that she was not "absolutely" certain she would never vote for a death penalty. When asked, however, if she could think of any case in which she would impose the death penalty, she said "not immediately." When allowed some time to think about it, she stated, "No. No. I guess conscientiously I would have to say that I would absolutely vote for the life without parole." Just to be sure, the prosecutor again asked if, regardless of the evidence, the prospective juror would "in every case, automatically and absolutely vote for life imprisonment without the possibility of parole and never vote for a verdict of death." Her reply was, "I would have to say that I would." She concluded simply, "That's what I feel."

Defendant asserts the prospective jurors' responses, because preceded by statements such as "I believe" and "I think," did not establish sufficiently their unfitness as penalty jurors. Although language in some of our former opinions interpreting *Witherspoon, supra,* 391 U.S. 510, supports defendant's view (see, e.g., *People* v. *Lanphear* (1980) 26 Cal.3d 814, 843 [163 Cal.Rptr. 601, 608 P.2d 689]), the point has less force in view of *Witt, supra,* 469 U.S. 412, under which "unmistakable clarity" of the prospective juror's inability to consider a death verdict need not be shown. We conclude that under the circumstances here, the court could properly have concluded from their responses that both jurors' views would "prevent," or at least "substantially impair," performance of their duties as jurors at the penalty trial.

B. *Instructions and Argument on Mitigating Evidence and Jury Discretion*

1. *Factor (k)*

▮ The jury was given the unadorned factor (k) (§ 190.3, factor (k)) instruction (former CALJIC No. 8.84.1). As we held in *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813], footnote 10, this language is potentially confusing because it might be understood by the jury to preclude consideration of a defendant's general character and background evidence. Under *Easley,* both defendant's childhood history, as well as his artistic accomplishments, were relevant factors that the jury should have considered in deciding whether defendant should live or die.

Although the prosecutor initially suggested to the jury that defendant's painting ability and art work were not to be considered under factor (k),[10] he later retreated somewhat from this erroneously narrow interpretation of that factor. He conceded that defendant's character and background *were* a proper consideration for the jury, but argued that the mitigating evidence was insufficient to warrant a sentence of life in prison. He also specifically reminded the jury that despite defendant's prison-acquired "vocations"—presumably, including his painting—defendant continued to commit crimes after release from prison. In so arguing, he implicitly retreated from any prior erroneously narrow interpretation of factor (k).

Nonetheless, any doubt about the prosecutor's ambiguous message in this regard was cured by defense counsel. Defendant's second counsel expressly told the jury to consider defendant's artistic abilities: "He has certain talents. He can produce. He can make paintings, as you have seen here today. Certainly that's some contribution to human society." Similarly, he told the jury defendant's childhood history was a factor in mitigation. In his rebuttal argument, the prosecutor did not respond to defense counsel's assertion that artistic abilities constitute a mitigating factor, and he expressly conceded that the jury should consider defendant's childhood history as a mitigating factor. He told the jury: "One other point that [defense counsel] brought up was the aspect of this defendant's childhood and how he was treated, and that he felt it was a factor in mitigation. [¶] Fine. It's something you can certainly consider, whether you consider it to be in mitigation or not is up to you. But one thing you should think about is that throughout the defendant's discourse and statement to you about his childhood, of course he was getting choked up and fighting back tears, because it was an emotional, sympathetic story. [¶] But it's interesting to note that all of the sorrow that he showed was sorrow and pity for himself. He showed no remorse, no sorrow, no pity for any of the victims . . . . [¶] I leave you with that final thought."

Viewing the record as a whole, we conclude the jury properly understood it was to consider defendant's artistic evidence, as well as his childhood and

[10] The prosecutor stated: "Were there any other extenuating circumstances that somehow lessened the gravity of the crime? No. The only thing that the defendant has brought forward here that he testified to, he says he testified to it in behalf of his argument for death, is his ability to paint. [¶] Well, we can see that. These paintings are high quality. He does fine work for someone who certainly learned on his own, took the initiative to learn it in prison. He should be commended for that. That's fine. *But it certainly is not a factor in mitigation. [¶] When you hear the law as I anticipate the Court will instruct you, you won't hear anything about whether or not someone is a painter.* If this defendant happened to be a carpenter, happened to be a plumber, happened to be a lawyer and he went out and did these deeds that he did, just because he was any of those professions wouldn't make it a mitigating factor. In fact, some people might think if he was a lawyer who did it, it would be a factor in aggravation; but be that as it may, the occupation of a man is not a factor in mitigation." (Italics added.)

general background, in determining penalty. We therefore find no factor (k) error. In any event, given the character of the art work involved here (*ante*, p. 932), and in light of the charged crimes and his past violence (*ante*, pp. 926-928), and in view of the fact that, as the prosecutor suggested, defendant continued to commit violent criminal acts *after* acquiring his artistic "vocation," we conclude beyond a reasonable doubt that any error was harmless. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1032 [245 Cal.Rptr. 185, 750 P.2d 1342]; *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Having heard of (i) defendant's violent crime in the present matter, and (ii) his long history of similar violence against women, we cannot imagine the jury would have decided that defendant's paintings of, inter alia, violent sexual scenes, justified a different verdict.[11]

## 2. *Asserted Brown Error*

The jury was given the unadorned former CALJIC No. 8.84.2 instruction on its weighing and decisionmaking process. As we explained in *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], our concern in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], was that the unadorned instruction might, in two interrelated ways, lead the jury to misunderstand its weighing and decisionmaking responsibility. First, we were concerned that the jury might understand its "weighing" responsibility to require merely that it "count" the aggravating and mitigating factors. Second, we were concerned that the instruction might be understood to allow the jury to return a death sentence without having to come face-to-face with the question of whether, in the personal moral judgment of each juror, death is the *appropriate punishment in that case*. (*Allen, supra,* 42 Cal.3d at pp. 1276-1277.)

We have received no help from the People in analyzing these questions. Contrary to the position they took in *Brown* itself, the People now claim the statute does indeed set up a "mandatory" death penalty scheme (i.e., death is required, regardless of each juror's conclusion on appropriateness, so long as aggravating factors outweigh mitigating factors), and that such a scheme is permitted under *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]. We expressly rejected that interpretation of *Jurek* in *Brown* (40 Cal.3d at p. 541, fn. 11), and we see no reason to question our prior interpretation of that high court decision.

---

[11] Defendant makes an additional argument about the adequacy of the penalty phase instructions as they related to the jury's consideration of his "sympathy" evidence. He asserts the court erred in failing to make clear at the penalty phase that the standard "no sympathy" instruction given at the guilt phase was no longer applicable. We have rejected an identical claim in *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301].

■■■ Addressing the "first aspect" of our concern in *Brown*—i.e., whether the jury understood the nature of its weighing responsibility—the record reveals the following: Although the prosecutor at various points spoke to the jury in terms of "adding up" the aggravating and mitigating factors, his main theme was that the jury should weigh, and not merely "count," the factors. Indeed, the implicit message in his discussion of defendant's childhood history evidence was that the jury should *consider* the evidence, but accord it *little weight*. He also told the jury that in reviewing the various factors, "[t]he reasoning process that you apply is a weighing process, a balancing process." Defense counsel echoed this proper theme, and sought to correct any ambiguity left by the prosecutor on this point. He told the jury it was not simply to "count" rather than "weigh" the factors: "This is not what your function is. If that were the case, we would have an adding machine at the penalty phase." From the whole record, we conclude the jury was not misled about the nature of its weighing process.

■■■ We turn to the "second aspect" of our concern in *Brown, supra,* 40 Cal.3d 512—i.e., whether the jury understood that it was responsible for *deciding for itself whether death is appropriate* for the defendant.

The prosecutor told the jury: "If after hearing all of [the] evidence and listening to the arguments of counsel and listening to the law as the Court tells you the law is in California, and after deliberating with your fellow jurors, you felt that death was the appropriate punishment; and that's the issue here, what's the appropriate punishment in this case, you felt that death was the appropriate punishment, each of you said you would be able to return back into this courtroom and make the public statement as a member of the jury, that the defendant should die. [¶] I'm calling upon you to make that statement. [¶] I'm calling upon you to return that verdict." After this opening statement, the prosecutor continued: "It's not an easy verdict. It's not easy for me to stand here and argue for it. It's never easy for someone to ask for another man's life. But your burden is lightened in this case because of the law. [¶] The way the law is set up, as I'll explain it to you, the weighing process that you go through and the fact that if the aggravating circumstances outweigh the mitigating circumstances, you shall return a verdict of death. [¶] It's just that simple. The law lightens your burden in that regard, in the analysis that you go through."

Later, the prosecutor told the jury the weighing process was a "balancing process," and stated: "If the circumstances in aggravation outweigh the circumstances in mitigation, you shall return a verdict of death." He concluded his argument with the following: "I want to cover one more point with you before closing and that is to reiterate the points that I have already made; that is, in making your determination as to what is the appropriate

punishment. [¶] In this case, that is the issue: What is the appropriate punishment. You simply weigh the aggravating factors against the mitigating factors and whichever outweighs the other is the verdict you shall return according to the law. [¶] If the mitigating factors outweigh the aggravating factors, you shall return a verdict of life without the possibility of parole. If the aggravating factors outweigh the mitigating factors, you shall return a verdict of death." He then told the jury that based on the evidence, there was only one possible verdict here, that life without possibility of parole is not "appropriate" in this case, and that a verdict of death "is the correct answer and response according to the law to this type of first degree murder with this type of defendant having committed it. . . . [¶] The law provides for it, the law provides the weighing process and the law provides an answer here. It is a just answer and justice should be done according to the law and a death [verdict] returned."

Defense counsel responded by stressing that the jury should consider all of defendant's mitigating evidence, and that it should weigh, and not count, the various factors.

Although the question is close, we cannot agree that counsel's statements, read as a whole, misinformed the jury about its weighing and sentencing discretion. The major thrust of the prosecutor's argument emphasized the jury's duty to ascribe the weight it deemed appropriate to the relevant factors and to decide, based on these factors, what penalty was appropriate. We therefore find no *Brown* error.[12]

## C. *Defense Counsel's Failure to Present Mitigating Evidence*

 The record discloses that defense counsel, acquiescing in their client's wishes and acting contrary to their own considered judgment, failed to put on any mitigating evidence although some apparently was available to them. Defendant asserts this omission requires reversal under *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925], and *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251].

In *Deere,* the defense counsel acceded to his client's wish that available mitigating character evidence not be presented. We reversed the penalty for

---

[12] It follows that we also find no error under *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]. In that case, the high court reversed a death sentence because the prosecutor repeatedly and erroneously informed the jury that it was not the final arbiter of whether death was the appropriate penalty for the defendant. Instead, the prosecutor told the jury, a reviewing court would assess the record to make sure death was the appropriate penalty. (*Id.*, at pp. 324-333 [86 L.Ed.2d at pp. 236-242].) As we hold above, on this record we do not conclude that the jury was misled about its sentencing responsibility.

two reasons. We first reasoned that "[t]o allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision . . . . In [such a] case *the state's interest in a reliable penalty determination* is defeated." (41 Cal.3d at p. 364, italics added.)

Second, the majority reasoned that defense counsel, by simply acceding to his client's wishes and without making an independent tactical judgment about presentation of the mitigating evidence, rendered constitutionally ineffective assistance of counsel. The *Deere* court held that, as a matter of law, counsel acted unreasonably in failing to present the evidence over his client's objection, and that reversal was required.

*Burgener, supra,* 41 Cal.3d 505, was another case in which the defense counsel acceded to his client's wish that no mitigating evidence be presented. Additionally, the jury was left with an improperly narrow understanding of the scope of its factor (k) inquiry and its sentencing role and discretion under *Brown, supra,* 40 Cal.3d 512. Citing *Deere,* we reversed, based primarily on the first ground stated in *Deere*—i.e., that a sentence rendered under such circumstances is "unreliable."

*Deere* and *Burgener,* however, are distinguishable. Our dual concerns expressed in those cases stemmed from the fact that, based on counsel's accession to their client's wishes, no formal mitigating evidence—although plainly available—was presented to the sentencer. Here, by contrast, although defendant prevented his counsel from presenting third-party testimony in mitigation, he in fact presented such evidence himself in his penalty phase testimony. (*Ante,* at pp. 929-934.) Thus the jury had defendant's evidence in mitigation for it to consider in making its penalty determination. We therefore reject defendant's claim of *Deere-Burgener* "unreliability" or ineffective-assistance-of-counsel error.

D. *Defendant's Testimony That He Preferred the Death Penalty*

In related arguments, defendant asserts that his testimony stating he preferred the death penalty was itself improper. He asserts this "error" requires reversal because it may have resulted in an unreliable penalty verdict, and because it constituted improper aggravating evidence. We consider these contentions separately.

.1. *Sentence Reliability*

Defendant observes that our cases (*ante,* at pp. 956-961) stress that the federal Constitution, the 1978 death penalty law, and the CALJIC

instructions must be understood as requiring that the jury determine for itself whether, based on the statutory factors, death is appropriate in a given case. He asserts his death-preference testimony may have diminished the jury's sense of responsibility in this regard; in essence, he suggests, the jury might have concluded that if defendant's life was unimportant to him, the jury need not labor over the difficult moral question of whether death is appropriate in this case, and that the resulting sentence may therefore be "unreliable."

 Beyond doubt, the state has a strong interest in promoting the reliability of a capital jury's sentencing determination. (E.g., *Deere, supra,* 41 Cal.3d at pp. 362-364, and cases cited; *Burgener, supra,* 41 Cal.3d at pp. 541-542, and cases cited.) But it is equally well established that the accused has a fundamental right to testify in his own behalf, even if contrary to the advice of counsel. (*People* v. *Robles, supra,* 2 Cal.3d 205, 215.)

 There may be constitutionally permissible ways of dealing with the conflicting public and constitutional policies. For example, a trial court might give the jury a specially crafted "limiting instruction" after a defendant has delivered his death-preference testimony. Such an instruction might inform the jury that despite the defendant's testimony, it remains obligated to decide for itself, based on the statutory factors, whether death is appropriate. Assuming that such a limiting instruction should be given in appropriate cases, we cannot agree that a sua sponte instruction was required here.

 Sua sponte instructions are required only " ' "on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].) On this record, we are not prepared to say that the court had a duty, on its own, to divine the perceived conflict between defendant's testimony and the jury's statutory and constitutional responsibility, and to craft an instruction designed to remedy any potential diminution of "juror responsibility" based on defendant's testimony.

Accordingly, and in light of (i) the fact that the prosecutor did not mention defendant's death-preference testimony in his closing argument and (ii) the fact that the jury properly understood the scope of its consideration of defendant's mitigating evidence under factor (k) and its duty to exercise discretion to determine the appropriate sentence in this case, we conclude that defendant's death-preference statement did not render the

sentence "unreliable" as that term was used in *Deere, supra,* 41 Cal.3d 353, and *Burgener, supra,* 41 Cal.3d 505. (Cf. *People* v. *Williams (Stanley)* (1988) 44 Cal.3d 1127, 1152 [245 Cal.Rptr. 635, 751 P.2d 901] [sentence not "unreliable" on the record of that case, despite defense counsel's failure to present apparently available mitigating evidence].)

### 2. *Improper Aggravating Evidence*

█ In a similar argument, defendant suggests his testimony was inadmissible under the 1978 law, because it constituted nonstatutory aggravating evidence, and thus violated *People* v. *Boyd* (1985) 38 Cal.3d 762, 774 [215 Cal.Rptr. 1, 700 P.2d 782].

First, we question whether defendant should be allowed to assert his own testimony was reversible error. In any event, we believe *Boyd* is distinguishable. It stands for the proposition that the 1978 law prevents the prosecution from introducing, in its case-in-chief, aggravating evidence not contained in the various factors listed in section 190.3. But no such event occurred here; defendant, not the prosecution, presented the evidence. Moreover, as noted above, the prosecution made no effort to capitalize on the testimony. We conclude no *Boyd* error occurred here.

### E. *Necessity, Under the Circumstances, of a Psychiatric Examination to Determine Defendant's Competency*

█ As explained above, defendant "waived" his right to have counsel introduce certain evidence in mitigation. During in-chambers discussions, he made it clear to the court that he intended to testify on his own behalf, and that he would ask the jury for the death penalty. Over the court's and his counsel's advice, he proceeded as announced. He now stresses anew society's vital interest in knowing that a death sentence be, and that it appear to be, reliable, and he faults the court for failing to order, sua sponte, a psychiatric examination of him before allowing him to proceed as planned.

Section 1368, subdivision (a), provides that if, prior to judgment, "a doubt arises in the mind of the judge as to the mental competence of the defendant," the court should inquire of defense counsel regarding his client's competence and, if counsel believes that defendant may be incompetent, the court should order a hearing on the matter. The section further provides that even if defense counsel believes that his client is competent, the court may, in its discretion, order such a competency hearing. We have held that a competency hearing is mandatory when "substantial" evidence of the accused's incompetence has been introduced. (*People* v. *Stankewitz*

(1982) 32 Cal.3d 80, 91-92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 518-519 [58 Cal.Rptr. 374, 426 P.2d 942].)

In essence, defendant asserts that his announced intent to request that the jury return a death verdict, by itself, constituted substantial evidence of his incompetence. On these facts, we cannot agree.

The record reveals that many months before the trial started defendant first took the position that he did not want to spend the rest of his life in prison. By the time of the guilt phase, he had long contemplated his decision. At the in camera hearing before the penalty phase, defense counsel told the court he felt defendant's decision was "an informed choice." Further, after weeks of observing defendant, the court concluded defendant knew what he was saying and was of "sound mind."

Additional evidence that defendant's choice was thoughtful and informed is disclosed by the reasons he gave for decision: He did not want to return to the violence and danger of the prison system; he did not want to be "alone" anymore, having spent virtually his entire adult life in prison; he felt life in prison with no possibility of parole would be a wasted existence; and finally, he did not want to live with the "memory of Dixie Jean Wallace."

In view of defendant's lengthy history of previous incarceration, it cannot be said that his mental competency was brought into question merely because he chose death over another 30 or 40 years in prison, with virtually no hope of ever being free again.

This conclusion is in accord with the only other case we have discovered which appears to be on point. In *Autry* v. *McKaskle* (5th Cir. 1984) 727 F.2d 358, certiorari denied 465 U.S. 1090 [79 L.Ed.2d 909, 104 S.Ct. 1462], the defendant claimed his trial counsel was ineffective because he failed to request a competency hearing even though his client had (i) refused to allow him to put on any mitigating evidence, and (ii) stated his intention to ask the jury for death. The court held, inter alia, "the fact that [defendant] would prefer death over a long prison term alone . . ." was an insubstantial basis on which to find counsel acted unreasonably. (*Id.*, at pp. 361, 363.) The court then stated: " 'The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of one's own life at whatever cost is the *summum bonum,* a proposition with respect to which the greatest philosophers and theologians have not agreed and with respect to which the United States Constitution by its terms does not speak.' " (727 F.2d at p. 363, quoting

*Lenhard* v. *Wolff* (1979) 443 U.S. 1306, 1312-1313 [61 L.Ed.2d 885, 890-891, 100 S.Ct. 3] (Rehnquist, J., in chambers.) (See also *Felde* v. *Blackburn* (5th Cir. 1986) 795 F.2d 400, 401-403 [following *Autry*, but remanding for an evidentiary hearing in light of (i) defendant's insanity defense and (ii) an incomplete record].)

Similarly, we conclude defendant's conduct here did not, in itself, constitute substantial evidence of his incompetence, and hence the court did not err by failing to order, sua sponte, a psychiatric examination of defendant before allowing him to proceed as announced.

### F. *Other Penalty Phase Issues*

#### 1. *Extreme Mental or Emotional Disturbance*

The jury was instructed pursuant to CALJIC No. 8.84.1 to consider, under factor (d), "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." (§ 190.3, subd. (d).) Defendant claims that by limiting consideration to "extreme" mental or emotional disturbance and not permitting lesser disturbances to be considered, the instruction violates the constitutional requirement that the jury must be permitted to give weight to any aspect of a defendant's character, record, or offense which may be offered to mitigate punishment. We have rejected this claim of error in *People* v. *Ghent, supra*, 43 Cal.3d 739, 776 [1977 law]. As explained in *Ghent*, we believe the instructions as a whole allowed the jury to consider the full range of defendant's mental or emotional disturbance evidence.

#### 2. *Giving Former CALJIC No. 8.84.1 in Full*

Defendant asserts the court should have deleted from the standard instruction the assertedly "inapplicable" factors, and that it was error to read to the jury the entire statutory list of factors. Again, we have addressed and rejected that claim in recent opinions. (*Ghent, supra*, 43 Cal.3d at pp. 776-777; *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].) As explained in those cases, presentation of the entire range of factors is necessary in order to allow the jury to decide for itself whether asserted factors are present on the record before it, and to weigh those factors accordingly.

#### 3. *"Double Counting" of Former Section 190.3, Factors (a) and (b)*

In *Miranda, supra*, 44 Cal.3d at pages 105-106, we held the jury should not be told that the "circumstances of the present crime" can be

considered as aggravating factors under both factors (a) (which establishes as a sentencing factor "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . .") *and* (b) (which establishes as a sentencing factor "the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence"). (§ 190.3, factors (a), (b).)

Here neither the court nor the prosecutor told the jury to "double count." Defendant, however, insists the court had a sua sponte duty to tell the jury that it should not, on its own, consider the facts of the present crime as aggravating factors under both factors. We cannot agree such an instruction was required; in the absence of misleading prosecutorial argument to the contrary, and in view of the instruction as a whole, we believe a reasonable jury would have interpreted factor (b) as encompassing only violent criminal activity *other* than the capital offense. (*Miranda, supra,* 44 Cal.3d at p. 106.)

### 4. *Determination That Death Is Appropriate "Beyond a Reasonable Doubt"*

Defendant asserts the court erred in failing to instruct the jury to determine, beyond a reasonable doubt, whether death is the appropriate penalty in this case. We have rejected this claim of error in *People* v. *Allen, supra,* 42 Cal.3d 1222, 1285.

### 5. *Comparative Sentence Review*

Defendant asserts the statute is unconstitutional because it does not provide for "comparative sentence review." As we have explained in *Allen, supra,* 42 Cal.3d at page 1285, and *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [232 Cal.Rptr. 849, 729 P.2d 115], the claim is meritless.

Defendant also asserts his sentence cannot stand under *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697], and *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921]. As we explained in *Allen, supra,* "there [is no] merit in any assertion that the punishment prescribed for the offense in question [here, burglary-robbery-kidnapping-rape-murder] is more severe than that prescribed for less serious crimes, or that the death penalty for defendant's crime is disproportionate to the punishment prescribed for the same offense in other jurisdictions." (42 Cal.3d at p. 1286.) Nor, in light of the facts of this case (*ante,* pp. 926-928), can defendant credibly assert the punishment imposed is disproportionate to his individual culpability.

## 6. Application for Modification of Death Judgment Under Section 190.4, Subdivision (e)

In every case in which a death penalty is returned, section 190.4, subdivision (e), provides the trial judge must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).)

■ Defendant asserts the court committed three errors in its statutory modification ruling. First, he contends the court demonstrated an unconstitutionally narrow interpretation of factor (k) (§ 190.3, factor (k)). Second, he claims the court gave no consideration to his "mental disturbance" evidence because, as the court concluded, such evidence was not shown to be "extreme." Finally, he notes that the court considered the circumstances of the capital offense as an aggravating factor under both factors (a) and (b) of section 190.3.

As to the first point, it is not apparent that the court applied an erroneously narrow view of mitigation under factor (k). The court's discussion of factor (k) was as follows: "With respect to this factor, the Court has considered the Defendant's account of his deprived childhood and . . . long imprisonment and the effect that may have had on the Defendant. The Court finds no other extenuating factors or circumstances of the gravity of the crimes the Defendant has committed. The Court, therefore, finds no circumstances that would justify mitigation under this consideration."

Unlike defendant, we do not read this as suggesting the court understood factor (k) to encompass only circumstances that, in a literal sense, extenuated or provided some kind of excuse for the capital crimes. The court's comments more likely reflect its conclusion that although it had *considered* defendant's evidence which was extraneous to the circumstances of the capital crime itself, it did not view the weight of that evidence as being sufficiently mitigating to upset the jury's penalty verdict.

On the second point, we earlier rejected defendant's similar assertion in our review of the jury's penalty determination: Both the jury, and the court, were free to consider the full range of defendant's "mental or emotional disturbance" evidence under factor (k), and the record does not disclose they failed to do so.

As to the final point, we agree the court erred in "double counting" the circumstances of the capital crime under both subdivisions (a) and (b). On the facts of this case, however, we cannot conclude this amounted to prejudicial error, under any standard of review.

## V. Sentence Enhancements

As noted above, defendant received a 37½-year prison sentence in addition to the death sentence. Ten years of that sentence resulted from defendant's admission at the close of the prosecution's case-in-chief that he had suffered two prior rape convictions, for each of which he had served a state prison term. (§ 667.5, subd. (c).) He asserts the judgment must be modified to strike the 10-year enhancement because, he notes, the trial court did not expressly advise him of his right to a jury trial on the issue of the priors.

Before accepting his admission, the court properly advised defendant of his rights to cross-examine witnesses, to call his own witnesses, to remain silent and to be represented by counsel, as well as the legal consequences of admitting the priors. Instead of expressly telling defendant he had a right to a "jury trial," however, the court told defendant he had the right to a "hearing" at which the truth of the priors would have to be proved beyond a reasonable doubt.

The law is well settled that before an accused can validly admit a prior felony conviction, he must be advised of, and waive, his rights to a jury trial, confrontation, and his rights against self-incrimination as to the prior conviction, and he must also be advised of the legal consequences of his admission. (*In re Yurko* (1974) 10 Cal.3d 857, 863-864 [112 Cal.Rptr. 513, 519 P.2d 561].)

The People implicitly concede the error, but argue it is harmless on these facts. We agree. On this record there is no reasonable probability that, if the term "jury trial" instead of "hearing" had been used, defendant (i) would have denied the priors and (ii) they would not have been found true. There is no dispute that defendant had suffered the priors and served prison terms therefor. We therefore conclude the error was harmless. (*People* v. *Prado* (1982) 130 Cal.App.3d 669, 675-676 [182 Cal.Rptr. 129]; *People* v. *English* (1981) 116 Cal.App.3d 361, 369-370 [172 Cal.Rptr. 122].)

## VI. The Habeas Corpus Petition

Petitioner claims his trial counsel's accession to his demands that no formal mitigating evidence be presented requires reversal of the penalty

judgment. As we noted above, however, although defendant blocked counsel's attempt to present such evidence, defendant did in fact present mitigating evidence in his own testimony. Also, as we held in *People v. Williams (Stanley), supra,* 44 Cal.3d 1127, 1153, such a claim cannot succeed if the petitioner has failed to disclose what the "withheld" evidence would have shown. The present petition contains no declaration or affidavit from any prospective witness; it merely repeats much of the same evidence presented in defendant's direct testimony, and recites appellate counsel's statement that he has reviewed the file and believes there are certain unspecified persons who *could* provide presumably additional, but unspecified, mitigating evidence. This is insufficient to state a prima facie case for relief.

## VII.

The judgment is affirmed in its entirety. The petition for a writ of habeas corpus is denied.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it affirms the judgment as to guilt and the determination of death-eligibility. I also concur in the denial of the petition for a writ of habeas corpus.

I dissent, however, from the judgment insofar as it affirms the judgment as to penalty. In my opinion, the verdict of death in this case does not meet the standards of reliability that the Eighth Amendment establishes. This is so for two independent but nevertheless related reasons. First, in violation of the principles set forth in *People v. Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], the jurors were misled as to the nature of the determination they were called on to make in fixing penalty. Second, contrary to the mandate of *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], the jurors were led to entertain the erroneous belief that the "truly awesome responsibility'" for making the penalty determination did not rest on them and them alone.

To begin with, I believe that in combination with the prosecutor's closing argument, the court's instructions, which embodied the mandatory sentencing language of Penal Code section 190.3 (hereafter section 190.3), may have misled the jurors to defendant's prejudice as to the scope of their sentencing discretion and responsibility under the 1978 death penalty law.

Section 190.3 states in relevant part that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circum-

stances referred to in this section, *and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances.*" (Italics added.)

In *Brown* this court held that section 190.3, as construed therein, was not unconstitutional. (40 Cal.3d at pp. 538-544.) In conformity with settled constitutional principles, it interpreted the statutory language to require jurors to make " . . . 'an individualized determination on the basis of the character of the individual and the circumstances of the crime'" (*id.* at p. 540, italics deleted) and a " ' " . . . moral assessment of [the] facts . . ."'" (*ibid.*)—and thereby decide "which penalty is appropriate in the particular case" (*id.* at p. 541).

Although it upheld the constitutionality of section 190.3, the court nevertheless recognized that when delivered in an instruction the provision's mandatory sentencing language might mislead jurors as to the scope of their sentencing discretion and responsibility. (40 Cal.3d at p. 544, fn. 17.) Specifically, it believed that a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale'" (*id.* at p. 541). It also believed that a juror might reasonably understand the language to require him to vote for death if he finds that the evidence in aggravation outweighs the evidence in mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.) For this reason it directed trial courts thereafter to instruct jurors in conformity with the principles set forth therein, rather than in the bare words of the statute. (*Ibid.*) With respect to cases—such as the present—in which the jurors had been instructed in the statutory language, it announced that it would examine each such appeal on its merits to determine whether the jurors may have been misled to the defendant's prejudice. (*Ibid.*)

I turn now to the case at bar. As stated above, the court instructed the jury in accordance with the potentially misleading words of section 190.3. Further, as will appear, the prosecutor's closing argument rendered those words misleading in the context of this case.

The prosecutor's argument was relatively brief. Its theme was that under the evidence adduced at trial the jurors were required to find as a fact that the aggravating circumstances outweighed the mitigating circumstances, and that consequently under the law applicable to the case they were required to fix the penalty at death.

The prosecutor opened his argument with the following statement.

"Ladies and gentlemen, I am going to be brief with you. . . . I am going to be brief with you now because the evidence is plain and simple. [¶] You remember, as I told you during the argument in the guilt phase, I called upon you to remember the promises that you made, the statements that you made under oath when you were being selected as a juror. [¶] I am calling upon you also at this time to abide by the statements you made during voir dire, during questioning, during the selection of you as jurors. [¶] Each of you were asked whether or not you would be able to follow the law no matter what the law was, no matter whether you disliked it or not. You all said you would be able to put your personal feelings aside and you would be able to follow the law. That's all I'm asking you to do at this time, is simply to follow the law, and I will be explaining the law to you in a few minutes."

The prosecutor continued: "If after hearing all of [the] evidence and listening to the arguments of counsel and listening to the law as the Court tells you the law is in California, and after deliberating with your fellow jurors, you felt that death was the appropriate punishment; and that's the issue here, what's the appropriate punishment in this case, you felt that death was the appropriate punishment, each of you said you would be able to return back into this courtroom and make the public statement as a member of the jury, that the defendant should die. [¶] I'm calling upon you to make that statement. [¶] I'm calling upon you to return that verdict. It's not an easy verdict. It's not easy for me to stand here and argue for it. It's never easy for someone to ask for another man's life. *But your burden is lightened in this case because of the law. [¶] The way the law is set up, as I'll explain it to you, the weighing process that you go through and the fact that if the aggravating circumstances outweigh the mitigating circumstances, you shall return a verdict of death. [¶] It's just that simple. The law lightens the burden in that regard,* in the analysis that you go through. [¶] It also, in this case, the facts lighten your burden, the facts of the murder itself, the murder of Linda Rogers, and the facts of this defendant's background, his criminal history certainly should lighten your burden." (Italics added.)

The prosecutor went on: "I mentioned to you during the guilt phase, and I'm going to repeat it now, *your duty as a juror is simply to apply the facts* as you have assimilated them here in court, and as you have heard them from the witness stand, and the various objects you heard or saw and were passed around, and that you saw during deliberation in the jury room, the various facts that you have had both in the guilt phase and at the penalty phase. [¶] *You simply apply those facts to the law, to reach the determination;* and in doing that the law provides for various factors for you to consider in reaching your determination." (Italics added.)

The prosecutor proceeded to set forth the statutory sentencing factors and to review the evidence adduced at trial under each of those factors,

apparently using a chart for the purpose. In the midst of his discussion, he digressed to emphasize again what he believed to be the nature of "[t]he final determination as to what is the appropriate punishment . . . ." Specifically, he stated: "But after you consider all the factors, it is not a beyond a reasonable doubt standard that I have to prove death to you. That is not the reasoning process that you apply. The reasoning process that you apply is a weighing process, a balancing process. [¶] As I anticipate the Court will instruct you, that is, you weigh the circumstances in aggravation. You weigh the circumstances in mitigation. *If the circumstances in aggravation outweigh the circumstances in mitigation, you shall return a verdict of death.*" (Italics added.)

After reviewing the evidence under the statutory sentencing factors, the prosecutor undertook to describe to the jurors how in his opinion they should make the penalty determination. He opened with the statement, "So as you go through these facts, *you add up* the circumstances in aggravation, first, versus the circumstances in mitigation." (Italics added.) On his chart he then identified each factor as aggravating, mitigating, or neither. Finally, he declared in effect that there were several factors in aggravation and none in mitigation.

The prosecutor concluded his argument as follows. "I want to cover one further point with you before closing and that is to reiterate the points that I have already made; that is, in making your determination as to what is the appropriate punishment. [¶] In this case, that is the issue: what is the appropriate punishment. *You simply weigh the aggravating factors against the mitigating factors and whichever outweighs the other is the verdict you shall return according to law. [¶] If the mitigating factors outweigh the aggravating factors, you shall return a verdict of life without the possibility of parole. If the aggravating factors outweigh the mitigating factors, you shall return a verdict of death. [¶] And if you look at one I have placed here in correspondence to these factors for consideration, you can see there is only one conclusion, there is only one verdict that you could possibly return in this case and that is of death, because there are no mitigating factors according to law.*" (Italics added.)

The prosecutor closed thus: "The law provides for [death], the law provides the weighing process and the law provides an answer here. It is a just answer and justice should be done according to the law and a death [verdict] returned. [¶] Thank you."

From the foregoing it is plain that in his closing argument the prosecutor caused the very harm the court feared in *Brown*. First, he misled the jury as to the nature of the weighing process. He effectively told the jurors that, just

as in the guilt phase, their determination would be "simply a finding of fact . . . ." (*People* v. *Brown, supra,* 40 Cal.3d at p. 540.) He also presented the penalty-fixing process as essentially a "mere mechanical counting of factors on each side of the imaginary 'scale' . . . ." (*Id.* at p. 541.) It is true, as the majority observe, that at certain points in his argument the prosecutor spoke of the jury's task in terms that perhaps do not portray the weighing process as narrowly cabined. It is also true that in his very brief argument one of the defense team told the jurors that their function was not "a matter of counting checks. . . . If that were the case, we would have an adding machine at the penalty phase." To my mind, however, such comments seem insufficient to cure the "counting" error—and do not even address the "fact-finding" error.

Second, the prosecutor misled the jurors as to the nature of the ultimate decision they were called on to make. He told the jurors, time and again, that if they found that the evidence in aggravation outweighed the evidence in mitigation they were *compelled* by the law to vote for death—even though they were subject to no such compulsion. (*People* v. *Brown, supra,* 40 Cal.3d at pp. 538-544.) It is true, as the majority imply, that at certain points in his argument the prosecutor urged that death was the "appropriate" penalty in this case. But through such comments—which I have quoted in their context—he can reasonably be understood to have meant only that death was compelled by the law and not proper as a moral judgment.

My assessment of the effect of the prosecutor's argument is unaffected by the fact that one of the defense team requested the jurors to spare defendant's life. In the face of the mandatory language of the instruction and the prosecutor's repeated quotation, paraphrase, and explication of that language, counsel's statement would evidently be heard as little other than a plea for the jurors to depart from their oaths and dispense a mercy that was not theirs to give.

On the basis of the foregoing analysis I am compelled to conclude that *Brown* error occurred in this case.

Next, I believe that the prosecutor's argument was independently objectionable under *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, as an attempt to minimize the jury's sense of responsibility for determining the appropriateness of death.

In *Caldwell* the high court stated the relevant facts as follows. "In their case for mitigation, [Caldwell's] lawyers put on evidence of [his] youth, family background, and poverty, as well as general character evidence. In their closing arguments they referred to this evidence and then asked the

jury to show mercy. The arguments were in large part pleas that the jury confront both the gravity and the responsibility of calling for another's death, even in the context of a capital sentencing proceeding.

"<sub>.</sub> . . . . . . . . . . . . . . . . .

"In response, the prosecutor sought to minimize the jury's sense of importance of its role. . . . The prosecutor's argument, defense counsel's objection, and the trial court's ruling were as follows:

"'ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they . . .

"'COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.

"'ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.

"'THE COURT: Al[l] right, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.

"'ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said "Thou shalt not kill." If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.'" (472 U.S. at pp. 324-326 [86 L.Ed.2d at pp. 236-237].)

The jury returned a verdict of death and the court sentenced the defendant accordingly.

The United States Supreme Court reversed the judgment as to penalty on the ground that "it is constitutionally impermissible to rest a death sentence

on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at pp. 328-329 [86 L.Ed.2d at p. 239].)

The court reasoned, in part, that an argument such as the prosecutor's was prejudicial in that it "offers jurors a view of their role which might frequently be highly attractive. A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community. Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion. [Citations.] Given such a situation, the uncorrected suggestion that the responsibility for any ultimate determination of death will rest [elsewhere] presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." (*Id.* at pp. 332-333 [86 L.Ed.2d at p. 242].)

The court explained: "for a sentencer to impose a death sentence out of a desire to avoid responsibility for its decision presents the specter of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns. The death sentence that would emerge from such a sentencing proceeding would simply not represent a decision that the State had demonstrated the appropriateness of the defendant's death. This would thus also create the danger of a defendant's being executed in the absence of any determination that death was the appropriate punishment." (*Id.* at p. 332 [86 L.Ed.2d at p. 241], fn. omitted.)

I apply this reasoning to the case at bar. At the penalty phase the prosecutor repeatedly sought to minimize the jury's sense of that responsibility. As the quoted portions of his argument plainly show, he told the jurors in essence that the responsibility for deciding the appropriateness of death rested not on them but on a reification he called "the law," which made the ultimate penalty automatic if they found as a fact that the evidence in aggravation outweighed the evidence in mitigation. It was not they but "the law," he insisted, that bore the "burden" of condemning defendant to death. It is true that the prosecutor told the jurors that in the abstract returning a verdict of death was "not . . . easy." But he made the statement only as an introduction to his claim that to return such a verdict here would not be all that difficult: "But your burden is lightened in this case because of the law. [¶] The way the law is set up, . . . if the aggravating circumstances outweigh the mitigating circumstances, you shall return a verdict of death. [¶] It's just that simple. The law lightens your burden in that regard . . . ."

On the basis of the foregoing analysis I am compelled to conclude that *Caldwell* error occurred in this case.

The majority do not adequately attempt to show that no *Caldwell* error occurred. Indeed, they reduce the issue to a footnote, even though it was squarely raised and vigorously argued by defendant.

Assuming for purposes of discussion that harmless-error analysis is applicable in the present context, on this record I cannot deem either the *Brown* error or the *Caldwell* error to be nonprejudicial. In vacating the sentence of death in *Caldwell,* the high court explained: "This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.' In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires. The sentence of death must therefore be vacated." (*Id.* at p. 341 [86 L.Ed.2d at p. 247].)

Until today, this court too had premised its capital decisions on the assumption that the jury recognizes its grave responsibility when it considers the question of life or death. In the case at bar the *Brown* error threatened, and the prosecutor's independently erroneous argument sought, to minimize the jury's sense of that responsibility. Because I cannot say that either error was without effect, I must conclude that the jury's decision does not meet the reliability requirements of the Eighth Amendment.

For the foregoing reasons, I would hold that the verdict of death must be vacated because of *Brown* and *Caldwell* errors. Accordingly, I am compelled to dissent from the affirmance of the judgment as to penalty.

**BROUSSARD, J.**—I concur in the opinion to the extent that it affirms the judgment of guilt, and the finding of special circumstances. I dissent to the imposition of the death penalty.

I.

In *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954], the United States Supreme Court said that "in all but the rarest kind of capital case," the jury cannot "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." In *People* v. *Harris* (1984) 36 Cal.3d 36, 71 [201

Cal.Rptr. 782, 679 P.2d 433], we held, citing *Lockett,* that a trial court erred in excluding evidence of Harris's poetry. That poetry, we noted, could show Harris as a unique, sensitive, feeling person (pp. 69-70); it could also show that he possessed a talent which he could use for the benefit of others if he were allowed to live.

Defendant in the present case is an accomplished artist who has sold over 90 paintings and won numerous prizes. If a jury is entitled to hear and consider Harris's poetry as a mitigating factor, certainly it would be entitled to consider defendant's far greater artistic achievement.

Under the instructions given by the trial court, however, defendant's artistic talent could be considered, if at all, only under Penal Code section 190.3, factor (k), which speaks of matters extenuating the gravity of the crime. We have recognized, however, that those instructions are ambiguous, and could be misunderstood to permit jury consideration only of matters which somehow lessened the seriousness of the crime itself, not of other character and background evidence. (*People* v. *Easley* (1983) 34 Cal.3d 858, 878 at fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].)

The prosecutor here resolved that ambiguity, informing the jury clearly and unequivocally—but erroneously—that it could not consider defendant's artistry as a mitigating consideration under factor (k). He said: "Were there any other extenuating circumstances that somehow lessened the gravity of the crime? No. The only thing that the defendant has brought forward here that he testified to, he says he testified to it in behalf of his argument for death, is his ability to paint. [¶] Well, we can see that. These paintings are high quality. He does fine work for someone who certainly learned on his own, took the initiative to learn it in prison. He should be commended for that. That's fine. *But it certainly is not a factor in mitigation.* [¶] *When you hear the law as I anticipate the Court will instruct you, you won't hear anything about whether or not someone is a painter.* If this defendant happened to be a carpenter, happened to be a plumber, happened to be a lawyer and he went out and did these deeds that he did, just because he was any of those professions wouldn't make it a mitigating factor. In fact, some people might think if he was a lawyer who did it, it would be a factor in aggravation; but be that as it may, the occupation of a man is not a factor in mitigation." (Italics added.)

The majority opinion acknowledges that the prosecutor's statement was erroneous, but asserts that he "later retreated somewhat" (p. 957) from this view when he later conceded that defendant's character and background were a proper consideration but insufficient to warrant a life sentence. "In

so arguing," they assert, "he implicitly retreated from any prior erroneously narrow interpretation of factor (k)." (P. 957.)

These carefully qualified words—"later retreated somewhat," and "implicitly retreated"—betray the majority's uneasiness with their conclusion. (The majority's addition of a discussion of prejudice, after finding no error, further indicates their insecurity with that conclusion.) What the prosecutor did was argue that defendant's brutalized childhood did not justify giving him only a life sentence. From that discussion one could infer, perhaps, a concession that under some circumstances a defendant's childhood might be mitigating.[1] But it would take a careful and sophisticated legal analysis to infer from that implied concession a further implied concession that defendant's artistic talent could be considered.[2]

What the jury heard was a clear, unequivocal statement from the prosecutor that defendant's artistry could not be considered as a mitigating factor. It is sophistry to suggest that the jurors may have taken facially unrelated statements by the prosecutor and, by a process of complex legal reasoning, found a latent ambiguity in the prosecutor's comments.

The majority assert, however, that the prosecutor's misstatement was "cured" by defense counsel. (P. 957.) I can understand how a judicial admonition may cure improper argument, but how can a comment by defense counsel do the job? At best, all defense counsel can do is raise a conflict, leaving the jury with two contradictory interpretations of the law, one correct and one erroneous.

When the majority assert that defense counsel "cured" the prosecutor's error, they assume that the jury followed the defense interpretation. I see no basis for making that assumption. If we must decide which view the jury

---

[1] The majority also note that the prosecutor reminded the jury that despite defendant's prison-acquired vocations, defendant committed crimes after his release from prison. Nothing in this statement implies that the jury could consider defendant's artistic accomplishment as a mitigating factor in itself. And no reasonable juror could think that was what the prosecutor intended, not when that prosecutor had told him, minutes earlier, that defendant's artistic ability "certainly is not a factor in mitigation."

[2] The jury would have to go through the following reasoning process: The prosecutor said that factor (k) includes only those matters which lessen the gravity of the crime. But he also said that defendant's traumatic childhood did not justify a life sentence. The way he said that implied that we could consider defendant's childhood, but that it does not weigh enough to call for a life sentence. If we can weigh the events of his childhood, even though they do not weigh enough to tip the balance, we should also be able to weigh the events of his adult life. This means we should be able to consider his past artistic achievements and, by further implication, his present talent and possible future achievements. So when the prosecutor said such defendant's artistry " 'certainly is not a factor in mitigation,' " he really did not mean it, because that statement might be inconsistent with the way he analyzed defendant's childhood.

followed, the better bet is that they followed the prosecutor. As pointed out by Justice Peters in *People* v. *Talle* (1952) 111 Cal.App.2d 650, 677 [245 P.2d 633]: "Defense counsel and the prosecuting officials do not stand as equals before the jury. Defense counsel are known to be advocates for the defense. The prosecuting attorneys are government officials and clothed with the dignity and prestige of their office. What they say to the jury is necessarily weighted with that prestige."[3]

It is not necessary, however, for us to decide whom the jury believed. The issue we must decide is that stated by Justice O'Connor in her concurring opinion in *California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed 2d 934, 943, 107 S.Ct. 837]]: whether "[i]n combination with the instructions, the comments of the prosecutor"—note that she does not mention defense counsel—"may create a 'legitimate basis for finding ambiguity concerning the factors actually considered by the' jury." Here the instruction was ambiguous, the prosecutor said the jury could not consider defendant's artistic talent, and the defense said it could. On these facts, how can anyone say there is no legitimate basis for ambiguity as to whether the jury thought it could consider that evidence?

## II.

I join in the concurring and dissenting opinion of Justice Mosk, which concludes that the prosecutor's argument misled the jurors with respect to both the nature of the penalty determination and the responsibility which they bear. I write to add my views on some aspects of this issue.

This is the third case in recent months in which we consider a prosecutor's argument designed to persuade a jury that the law in some fashion relieves jurors of full responsibility to determine whether a defendant should live or die. In *People* v. *Hendricks* (1988) 44 Cal.3d 635 [244

---

[3] "In many situations, defense and prosecution arguments that seem to be equivalent will not be equivalent in the eyes of the jury. . . . [E]specially in the penalty trial context . . . it [the prosecutor's argument] is likely to have a greater impact on the jury because the jury is much more likely to be swayed by the prosecutor than the defense counsel. [¶] In any criminal case, jurors will be likely to view the prosecutor in a more favorable light than defense counsel. As Alschuler has said, 'The assistant district attorney is the representative of an elected, presumably popular public official, and the mere fact that he is a state employee may create a sense of trust and an expectation of fairness that a defense counsel would find difficult to match through the most strenuous exertion of his charm.' [Quoting Alschuler, *Courtroom Misconduct by Prosecutors and Judges* (1972) 50 Tex. L. Rev. 629, 632.] Moreover, the fact that the penalty stage jury has already found the defendant guilty of a capital crime places defense counsel at a special disadvantage. Because the jury has accepted the prosecutor's position at the guilt stage, they are especially likely to view the prosecutor as more credible than defense counsel and to give greater weight to any comments he may make during closing argument." (White, The Death Penalty in the Eighties (1987) p. 97.)

Cal.Rptr. 181, 749 P.2d 836], the prosecutor told the penalty jury that they were finders of fact, that while they had a very important decision to make, the law " 'takes a little bit of sting out in the sense that you have to decide facts. Once you decide, if you do, that the aggravating circumstances outweigh the mitigating circumstances, its automatic. You shall impose death.' " (P. 659.) Despite this obviously erroneous advice given the jury—a penalty jury does not find facts, but functions as the conscience of the community to render a normative judgment—this court affirmed the death penalty.

In *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669], the prosecutor told the jurors that the law did not require them to shoulder a burden of determining what "is just or true in this particular case." (P. 254.) The jury should return the death penalty, he said, because " 'when you add up the circumstances in this case, there is no other conclusion that you can come to, if you stick within the protection of the law . . . . [¶] All juries facing the same set of facts, would come up with the same decision, and this law, hiding under the veil of that law, will protect you from shouldering the weight of your decision.' " (P. 255.) The court reversed the penalty judgment, without citing *Hendricks, supra,* 44 Cal.3d 635.

In the present case the prosecutor told the jury: "It's never easy for someone to ask for another man's life. But your burden is lightened in this case because of the law. [¶] The way the law is set up, as I'll explain it to you, the weighing process that you go through and the fact that if the aggravating circumstances outweigh the mitigating circumstances, you shall return a verdict of death. [¶] It's just that simple. The law lightens your burden in that regard . . . . [Y]our duty as a juror is simply to apply the facts . . . . You simply apply those facts to the law, to reach the determination . . . as to what is the appropriate punishment. . . . If the circumstances in aggravation outweigh the circumstances in mitigation, you shall return a verdict of death." The majority affirm the death judgment, without citing *Milner, supra,* 45 Cal.3d 227.

The prosecutors in each of these three cases are saying basically the same thing. They are telling the jurors that they do not have the ultimate responsibility to determine whether the defendant should live or die. The law has taken the sting out of that decision, protected them from that responsibility, lightened their burden. Their role is a limited one. According to the prosecutors' argument, the jurors are finders of fact, who determine what aggravating and mitigating factors exist, place them in a scale, and report how the balance tips.

This argument radically misstates the role of the penalty jury. In *People v. Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] and *People v. Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], we recognized that jury instructions in the language of the 1987 law could reasonably be interpreted "to require a juror (i) to determine whether 'the aggravating circumstances outweighed the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances . . . ." (*Allen, supra,* 42 Cal.3d at p. 1277.) As *Allen* emphasized, however, "we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion." (*Ibid.*) The prosecutor's argument here interpreted the instructions in exactly the manner we condemned in *Brown* and *Allen*. To tell the jurors that their function is one of finding facts, that once they have found the facts the law dictates the result, and that the law shields them from the full responsibility of determining whether the defendant should live or die, is error—in this case, in *Milner, supra,* 45 Cal.3d 227, and in *Hendricks, supra,* 44 Cal.3d 635. If there is a principled ground to distinguish the three decisions, it does not appear in our opinions.

The majority argues that the prosecutor in this case also spoke of the "appropriate punishment," a term which may imply a moral determination, and told the jurors that defendant deserved death. Was the prosecutor equivocating—telling the jury with one breath to render an objective, factual determination, and with the next to decide what result is morally appropriate? I think not. In context, it is clear to me that when the prosecutor said death was the "appropriate" punishment, he meant only that it was the punishment which would result from an objective weighing of aggravating and mitigating factors by a fact-finding jury. And while he told the jury that defendant deserved death, he did not say that the jury's task was to make that determination. To the contrary, his message was clear and consistent: if you follow the law and carry out an objective, non-normative weighing of the factors you must return a death penalty—and do not feel guilty about it, because fortunately this defendant really deserves death. Thus he concluded his argument: "The law provides for it, the law provides a weighing process and the law provides an answer here. It is a just answer and justice should be done according to the law and a death returned."

Since our opinions to date do not provide a method for analyzing issues such as that raised in the present case, I take this opportunity to set out my view of the matter. The 1978 death penalty law requires that jurors decide whether aggravating factors outweigh mitigating factors; the Constitution requires that they decide whether death is the appropriate penalty for this

defendant. There are two logical ways in which the jurors can relate these decisions. First, what seems to me the more natural way, is to weigh the factors objectively and use that analysis as a guide to deciding whether death is appropriate. This is apparently what we contemplated in *People* v. *Brown, supra,* 40 Cal.3d 512, 542, footnote 19, when we approved a jury instruction to the effect that to return a death verdict the jurors must be persuaded, not that the aggravating factors marginally outweigh the mitigating factors, but that they are "so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The other way is for the jury to take moral and normative considerations into account during the weighing process, adjusting the weights so that the decision whether aggravating factors outweigh mitigating reflects a normative decision whether death is appropriate. The majority opinion in *People* v. *Hendricks, supra,* 44 Cal.3d 635, 654, endorses this method.

When a prosecutor argues, as in this case, that a jury must return a death verdict if aggravating factors outweigh mitigating factors, his words by necessary implication bar the jury from deciding the case by one method we approved in *Brown, supra,* 40 Cal.3d 512, that of weighing the factors objectively, then determining whether the aggravating factors *so substantially* outweigh the mitigating as to warrant death. This leaves only the second method of deciding appropriateness—one of adjusting the weights themselves to reflect a moral assessment of the appropriateness of death.[4] If we are to affirm a judgment of death under such circumstances, we must satisfy ourselves that, even though many persons (such as the Attorney General arguing this case) would interpret the court's instructions to preclude a normative assessment during the weighing process, this particular jury in fact understood it had the power and duty to make such an assessment. We probably should insist upon some affirmative indication in the record that the jury understood that it must decide appropriateness during the weighing process; we should certainly not affirm when the record affirmatively shows that the jury was advised to the contrary.

In the present case the prosecutor told the jurors that the weighing process is akin to fact-finding—an objective, non-normative process with which the jurors, having sat through a guilt trial, were already familiar. A fact-finding jury does not make a moral assessment of the facts. If an attorney were to argue to a guilt phase jury that even though the evidence shows a fact to be true, the jury should find to the contrary in order to give

[4] One problem with the prosecutor's argument in *People* v. *Myers* (1987) 43 Cal.3d 250 [233 Cal.Rptr. 264, 729 P.2d 698], which led us to reverse the penalty judgment in that case, is that the prosecutor erroneously told the jurors that " 'It would not be appropriate for you to determine what result you want to obtain and then seek to shade the factors or the weight to give to the various factors.' " (P. 275.)

defendant the appropriate punishment, courts would without hesitation brand the argument as improper. Thus to tell a jury that it is a fact-finding body is to tell them that they should not concern themselves with the penal consequences of their findings—that it is not their function to decide what penalty is morally appropriate. A jury which believes it must determine factually whether aggravating factors outweigh mitigating and that the law then dictates the result is one which does not understand its function.

I would reverse the judgment of death.

Appellant's petition for a rehearing was denied August 18, 1988. Mosk, J., was of the opinion that the petition should be granted.